538 F.2d 349
 176 U.S.App.D.C. 1, 1 Media L. Rep. 2207
 The Honorable Shirley CHISHOLM et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
CBS, Inc., et al., Intervenors.
DEMOCRATIC NATIONAL COMMITTEE, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Company, Inc., and Radio Television
News Directors Association, Intervenors.
 Nos. 75-1951, 75-1994.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 26, 1975.
Decided April 12, 1976.
Rehearing Denied May 13, 1976.
 
 Harvey J. Shulman, Washington, D. C., with whom Collot Guerard, Washington, D. C., was on the brief for petitioners in No. 75-1951.
 Marcus Cohn, Washington, D. C., with whom Robert N. Smith, Martin J. Gaynes and Sheldon S. Cohen, Washington, D. C., were on the brief for petitioner in No. 75-1994.
 Werner K. Hartenberger, Deputy Gen. Counsel, F. C. C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Acting Associate Gen. Counsel, Stephen A. Sharp, Counsel, F. C. C., B. Barry Grossman and Lee I. Weintraub, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 
 
 1
 Timothy B. Dyk, Washington, D. C., with whom J. Roger Wollenberg and Daniel Marcus, Washington, D. C., were on the brief for intervenor CBS Inc., Joel Rosenbloom, Washington, D. C., and Richard D. Paisner also entered appearances for intervenor CBS, Inc.
 
 
 2
 James A. McKenna, Jr., Thomas N. Frohock, Washington, D. C., and John J. Smith, Washington, D. C., were on the brief for intervenor American Broadcasting Companies, Inc.
 
 
 3
 Corydon B. Dunham and Howard Monderer, Washington, D. C., were on the brief for intervenor National Broadcasting Company, Inc.
 
 
 4
 J. Laurent Scharff, Washington, D. C., was on the brief for intervenor Radio Television News Directors Association.
 
 
 5
 Ellen Show Agress and Earle K. Moore, New York City, were on the brief for intervenor Office of Communication of the United Church of Christ, et al.
 
 
 6
 Henry Geller, Washington, D. C., filed a brief on behalf of Aspen Institute Program as amicus curiae urging affirmance.
 
 
 7
 Kenneth J. Guido, Jr., Washington, D. C., filed a brief on behalf of Common Cause as amicus curiae urging affirmance.
 
 
 8
 Stephen I. Schlossberg, Detroit, Mich., entered an appearance for intervenor, International Union United Automobile, Aerospace and Agricultural Implement Workers of America.
 
 
 9
 Henry Geller, Washington, D. C., entered an appearance for the League of Women Voters of the United States as amicus curiae.
 
 
 10
 Before WRIGHT, TAMM and WILKEY, Circuit Judges.
 
 
 11
 Opinion for the court filed by Circuit Judge TAMM with whom Circuit Judge WILKEY concurs.
 
 
 12
 Dissenting opinion filed by Circuit Judge WRIGHT.
 
 TAMM, Circuit Judge:
 I. INTRODUCTION AND BACKGROUND
 
 13
 This case concerns perhaps the most important interpretation of the equal time provision of the Communications Act of 1934, 47 U.S.C. § 315(a),[1] which has arisen in the past decade. Petitioners, the Democratic National Committee ("DNC"), the National Organization for Women ("NOW"), and Representative Shirley Chisholm, ask us to review various aspects of a Memorandum Opinion and Order[2] of the Federal Communications Commission (hereinafter "FCC" or "Commission") reversing a statutory interpretation of over ten years' duration and holding that, henceforth, debates between qualified political candidates initiated by nonbroadcast entities (non-studio debates) and candidates' press conferences will be exempt from the equal time requirements of Section 315, provided they are covered live, based upon the good faith determination of licensees that they are "bona fide news events"[3] worthy of presentation, and provided further that there is no evidence of broadcaster favoritism. Our review of the legislative history surrounding passage of the "bona fide news event" exemption reveals that it is inconclusive as to whether Congress intended for these particular formats to be included, although we find substantial support for the Commission's new interpretation in the broad Congressional policies behind passage of the exemption increasing broadcaster discretion and encouraging greater coverage of political news and in the discretion granted the Commission in interpreting and applying the amendment to particular program formats. We therefore defer to the Commission's interpretation of the Act it is charged with administering. We also conclude that the Commission has properly exercised its discretion in accomplishing the reversal via declaratory order rather than through notice and comment rulemaking.
 
 
 14
 A. General Factual and Legislative Background
 
 
 15
 Section 315, as originally enacted and interpreted, had imposed upon broadcasters a duty of absolute equality of treatment of competing political candidates in the "use" of broadcast facilities, stating:
 
 
 16
 (a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate.
 
 
 17
 47 U.S.C. § 315(a).
 
 
 18
 For a number of years the FCC interpreted the equal time provision as inapplicable to the appearance of a candidate on a newscast, reasoning that such an appearance did not constitute a "use" of the broadcast facility insofar as the candidate did not directly or indirectly initiate the filming or presentation of the event. See, e. g., Allen H. Blondy, 40 FCC 284, 14 P & F Radio Reg. 1199 (1957). This interpretation became embodied in the Commission's official release of October 6, 1958, entitled "Use of Broadcast Facilities by Candidates for Public Office." Public Notice FCC 58-936, III-12; 105 Cong.Rec. 14459 (1959).
 
 
 19
 In 1959, however, the Commission effected a radical departure from its prior interpretation in the so-called "Lar Daly" case, Columbia Broadcasting System (Lar Daly), 18 P & F Radio Reg. 238, reconsideration denied, 26 FCC 715, 18 P & F Radio Reg. 701 (1959), and interpreted the statute to mean that the equal time rule applied even to the appearance of a candidate on a regularly scheduled newscast.[4] The Commission's position on this matter created a national furor, and it was feared that its strict application of the equal opportunities provision "would tend to dry up meaningful radio and television coverage of political campaigns." S.Rep. No. 562, 86th Cong., 1st Sess. 10 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2564, 2572.[5] This concern led Congress to conclude that the concept of absolute equality among competing political candidates would have to give way, to some extent, to two other "worthy and desirable" objectives:
 
 
 20
 First, the right of the public to be informed through broadcasts of the political events; and Second, the discretion of the broadcaster to be selective with respect to the broadcasting of such events.
 
 
 21
 Hearings on Political Broadcasts Equal Time Before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. 2 (1959) (comment of Chairman Harris).
 
 
 22
 Pursuant to these objectives, Congress amended Section 315(a) on September 4, 1959, to add the following exemptions:
 
 
 23
 Appearance by a legally qualified candidate on any
 
 
 24
 (1) bona fide newscast,
 
 
 25
 (2) bona fide news interview,
 
 
 26
 (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
 
 
 27
 (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),
 
 
 28
 shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 
 
 29
 P.L. 86-274, § 1, 73 Stat. 557, amending 47 U.S.C. § 315.
 
 
 30
 Thus armed with a not-so-clear Congressional directive generally exempting news broadcasting from Section 315's equal time requirements, the Commission set forth to apply the news coverage exemptions to specific kinds of events and coverage. In The Goodwill Stations, Inc. (WJR), 40 FCC 362, 24 P & F Radio Reg. 413 (1962), the Commission ruled that a radio broadcast of a debate sponsored by the Detroit Economic Club between the two major Michigan gubernatorial candidates, part of a regular series of broadcasts of Economic Club luncheons, failed to qualify for exemption under Section 315(a)(4) as "on-the-spot coverage of bona fide news events . . . ." Ten days later, the Commission held in National Broadcasting Co. (Wyckoff), 40 FCC 370, 24 P & F Radio Reg. 401 (1962), that a debate at the annual UPI convention featuring the two major California gubernatorial candidates could not qualify under the bona fide news event exemption. These two decisions, read together, effectively excluded all debates from the Section 315(a)(4) exemption. Two years later, the Commission ruled in response to a network's request that the broadcast of a press conference held by an incumbent President who is a candidate for reelection, or by a non-incumbent candidate for President, is a non-exempt "use" of the broadcast facility within the meaning of Section 315. Columbia Broadcasting System, Inc., 40 FCC 395, 3 P & F Radio Reg. 2d 623 (1964). The Commission's 1975 Opinion overrules these decisions concluding, inter alia, that they were based on an erroneous reading of the legislative history of Section 315(a)(4).
 
 
 31
 B. Description of Parties and Immediate Background
 
 
 32
 The Commission's 1975 Opinion was in response to petitions filed by the Aspen Institute Program on Communications and Society ("Aspen") and CBS, Inc. ("CBS"). The Aspen petition, filed on April 22, 1975, asked the Commission to reexamine its 1962 Goodwill and Wyckoff decisions, holding that debates between candidates could not qualify as "on-the-spot coverage of bona fide news events" under the Section 315(a)(4) exemption. Aspen Institute Program on Communications and Society Petition for Revision of First Report/Fairness Report in Docket No. 19260 or for Issuance of Policy Statement or Declaratory Ruling, April 22, 1975. J.A. 1. Aspen argued that these 1962 rulings were based on the mistaken assumption that Congress intended Section 315(a)(4) to apply only to newscasts in which the candidates' appearance was "incidental to" an independent newsworthy event, and urged the Commission to adopt an interpretation of the exemption consistent with the Congressional purpose to encourage and increase news coverage of political events. Such a broad, remedial construction, Aspen urged, would enable broadcasters to "more effectively and fully . . . inform the American people of important political races and issues" and to "make the Bicentennial a model political broadcast year." Opinion at 1; J.A. 1-3.
 
 
 33
 The CBS petition, filed on July 16, 1975, requested a ruling that Presidential press conferences could likewise qualify under the Section 315(a)(4) exemption from the equal opportunities requirements, so that broadcasters who covered such press conferences in the exercise of their professional news judgment would not incur equal opportunities obligations. Columbia Broadcasting System, Inc., Petition for Declaratory Ruling, July 16, 1975; J.A. 22. CBS pointed out that President Ford had formally announced his candidacy for the Republican nomination for President on July 8, 1975, more than 15 months before the election.[6] All broadcast appearances by the President thus potentially could give rise to equal opportunity demands by other candidates for the Republican nomination unless such appearances fell within the exemptions to Section 315. Broadcast coverage of Presidential press conferences under these circumstances would not be feasible throughout the entire period between the President's announcement and the 1976 election.[7] CBS requested that the Commission reexamine its 1964 ruling and interpret Section 315 as exempting live broadcast coverage of Presidential press conferences from the equal opportunities requirements where broadcasters in the exercise of their good faith news judgments decide that a conference is newsworthy. CBS Brief at 4-5. CBS argued that this interpretation was consistent with "the broad intent of Congress in enacting the 1959 amendments to Section 315 to ensure the free flow of vital news to the public and provide 'latitude for the exercise of good faith news judgment on the part of broadcasters and networks.' " CBS Brief at 5, quoting 105 Cong.Rec. 17782 (1959) (remarks of Rep. Harris). See also CBS petition at 12; J.A. 33. To adhere to the earlier rulings, CBS contended, would inhibit the free flow of news from the President to the people.
 
 
 34
 On September 2, 1975, the Democratic National Committee filed comments on the CBS petition, opposing reconsideration of the Commission's 1964 ruling that Presidential press conferences were not exempt from the equal opportunities requirements of Section 315. J.A. 45. Shortly thereafter, on September 12, 1975, the Honorable Shirley Chisholm and the National Organization for Women filed comments opposing both the CBS and Aspen Petitions. J.A. 70, 127.
 
 
 35
 The Commission's Opinion, released on September 30, 1975, acting on the CBS and Aspen petitions, overruled its 1964 CBS decision that Presidential press conferences could not qualify for exemption under Section 315(a)(4) and further held that press conferences of other candidates for political office broadcast "live and in their entirety" could also qualify for the "on-the-spot coverage of bona fide news events" exemption.[8] The Commission also overruled its Goodwill and Wyckoff decisions, supra, and held that Section 315(a)(4) exempts from the equal opportunity requirement candidate debates sponsored by non-broadcast entities, i. e., non-studio debates.
 
 
 36
 The basis for the Commission's reversal was its decision that the earlier cases had been based on a faulty reading of the legislative history surrounding the 1959 amendment. With respect to the debates concerned in the Goodwill and Wyckoff decisions, the Commission in 1962 had rejected the contention that, for the purposes of Section 315(a)(4), it was sufficient that a licensee had exercised its good faith news judgment in concluding that a particular debate constituted a bona fide news event which it wished to cover live and determined instead that debates could qualify neither as "bona fide news interviews" (because the candidates, not the broadcaster, controlled the format and participants), nor as "bona fide news events" (because the appearance of the candidates was not "incidental to" some other news event it was the event). In support of this "incidental to" test, the Commission had relied in 1962 on a 1959 House Committee Report[9] stating that "the principal test was 'whether the appearance . . . is incidental to the on-the-spot coverage of a news event or whether it is for the purpose of advancing the candidacy of a candidate.' " 40 FCC 364, 372-73, quoted in FCC Brief at 5. A second rationale advanced by the Commission was its fear that interpreting a debate to constitute a "bona fide news event" would effectively nullify the equal time objectives of Section 315 and deprive the other three exemptions of their meaning.[10]
 
 
 37
 The Commission's rationale for the 1964 CBS decision was essentially the same with respect to the Section 315(a)(4) exemption as its rationale for the earlier debate decisions: the appearance of the candidate was not incidental to some other independently newsworthy event. In addition, the Commission rejected the argument that the broadcaster's good faith judgment of the newsworthiness of an event was sufficient to qualify coverage of the event for the Section 315(a)(4) exemption. 55 FCC 2d at 701, para. 13; J.A. 146.
 
 
 38
 In its 1975 Opinion, the Commission concluded that the analysis upon which it had based its decisions in these three cases had been erroneous. The Commission now concluded that the "incidental to" test had been removed from the proposed legislation prior to its enactment in 1959. Id. at 703, para. 22; J.A. 150.[11] The "incidental to" requirement was, in fact, stricken in conference in the face of opposition during the floor debate in the House,[12] and the conference bill was adopted without the disputed language.[13] Under the new test, the Commission no longer seeks to determine whether the appearance of the candidate in a debate is the central aspect of the presentation or is merely incidental to some other independently newsworthy event, and
 
 
 39
 . . . a program which might otherwise be exempt does not lose its exempt status because the appearance of a candidate is a central aspect of the presentation, and not incidental to another news event.
 
 
 40
 Id. at 704-05, para. 23; J.A. 153.[14] The new test, in the Commission's words, "(A)llows reasonable latitude for exercise of good faith news judgments by broadcasters and networks by leaving the initial determination as to eligibility for section 315 exemption to their reasonable and good faith judgment." Id. at 708, para. 30; J.A. 157. The Commission further found that reversal of its prior decisions "comports with the original legislative intent and serves the public interest by allowing broadcasters to make a fuller and more effective contribution to an informed electorate." Id. at 706, para. 27; J.A. 154.
 
 
 41
 On September 26, 1975, Representative Chisholm and NOW filed their petition for review in this court. Shortly thereafter, all three major networks intervened. DNC filed its petition for review on October 8, 1975, and the two cases were consolidated.[15] Jurisdiction is properly invoked under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342.
 
 
 42
 II. LEGISLATIVE HISTORY OF THE NEWS COVERAGE EXEMPTIONS
 
 
 43
 Our starting point in determining the scope and meaning of Section 315(a)(4) is, of course, the intent of Congress. For this we look both to the statutory language itself and to the legislative history. In the words of Justice Frankfurter,
 
 
 44
 (a) statute, like other living organisms, derives significance and sustenance from its environment, from which it cannot be severed without being mutilated. Especially is that true where the statute . . . is part of a legislative process having a history and a purpose.
 
 
 45
 United States v. Monia, 317 U.S. 424, 432, 63 S.Ct. 409, 413, 87 L.Ed. 376, 382 (1943) (Frankfurter, J., dissenting).
 
 
 46
 We note initially that the four exemptions apply generally to news broadcasts and that subsection (4), with which we are directly concerned, is limited to "on-the-spot (live) coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto) . . . ." 47 U.S.C. § 315(a)(4) (1959) (emphasis added). All of the exemptions, in fact, contain the requirement that the program or event be "bona fide" news, yet the language itself provides no ready clue as to how this requirement is to be satisfied. It is unclear from the statute whether the test refers to the character of the event (i. e., its inherent newsworthiness), the nature of the candidate's appearance (i. e., whether the format is that of a debate, press conference, speech, etc.), or the candidate's relation to the broadcast (i. e., whether he "controls" it). Moreover, the exemption provisions do not reveal who is to make this crucial determination, the broadcaster or the Commission. The only clue from the language of Section 315(a)(4) is the parenthetical phrase which states that political conventions and activities incidental thereto presumably nominating and acceptance speeches definitely constitute "bona fide news events," and that the scope of the exemption extends to some other news events by some standard not apparent from the statutory language.
 
 
 47
 A. Legislative History Prior to the Passage of the News Exemptions
 
 
 48
 Central to the Commission's reversal of its Goodwill, Wyckoff and Columbia Broadcasting System decisions was its determination that those decisions were based upon an erroneous reading of the legislative history surrounding passage of the 1959 amendment to Section 315. Our examination reveals that the legislative history preceding passage of the amendment is inconclusive on the issue of whether Congress intended specifically to include or exclude non-studio debates and candidate's press conferences. It is clear, however, that Congress intended to give the Commission some leeway in interpreting the four exemptions and in applying them to particular program formats in order to further the basic purpose of the amendment, "(To) enable what probably has become the most important medium of political information to give the news concerning political races to the greatest possible number of citizens, and to make it possible to cover the political news to the fullest degree."[16] That the Commission has considerable discretion in this area is clear from the Senate Report, which states in part:
 
 
 49
 (T)he committee in adopting the language of the proposed legislation carefully gave the Federal Communications Commission full flexibility and complete discretion to examine the facts in each complaint which may be filed with the Commission. In this way the Commission will be able to determine on the facts submitted in each case whether a newscast, news interview, news documentary, on-the-spot coverage of news event, or panel discussion is bona fide or a "use" of the facilities requiring equal opportunity.
 
 
 50
 The Congress created the Federal Communications Commission as an expert agency to administer the Communications Act of 1934. As experts in the field of radio and television, the Commission has gained a workable knowledge of the type of programs offered by the broadcasters in the field of news, and related fields. Based on this knowledge and other information that it is in a position to develop, the Commission can set down some definite guidelines through rules and regulations and wherever possible by interpretations.
 
 
 51
 S.Rep. No. 562, 86th Cong., 1st Sess. 12 (1959), U.S.Code Cong. & Admin.News 1959, p. 2574 (emphasis added).
 
 
 52
 That Congress intended the Commission to play an important role in developing the Section 315 exemptions is also evident from Congress' decision not to legislate in detail, but rather to set out broad categories for exemption of news-related coverage and leave the Commission with the task of implementing Congressional intent.[17] See 105 Cong.Rec. 16227 (1959) (remarks of Rep. Celler); 105 Cong.Rec. 14455 (1959) (remarks of Sen. Pastore). Moreover, the equal time provision itself contains a provision, Section 315(d), granting the Commission authority to prescribe appropriate rules and regulations to carry out the provisions of Section 315. This is something more than the normal grant of authority permitting an agency to make ordinary rules and regulations, since the Commission already has such authority to "(m)ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter." 47 U.S.C. § 303(r) (1937). See Kay v. FCC, 143 U.S.App.D.C. 223, 443 F.2d 638, 643 (1970).
 
 
 53
 Although we believe it unnecessary here to retrace in detail the legislative history preceding passage of the 1959 amendment, we note that it provides substantial support, although inconclusive, for the Commission's interpretation. Under these circumstances, we believe it our duty to defer to the Commission's interpretation of the statute which it is charged with administering. This court has often reiterated the principle that
 
 
 54
 (i)n approaching the problem of statutory interpretation . . . we show "great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' "Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 359 F.2d 282, 283-84 (1966) (citation omitted). Such deference is especially appropriate where, as here, Congress has opted for legislative generality, leaving the agency with the task of evolving definitions on a case-by-case basis. See, e. g., Hearings on S. 1585, S. 1604, S. 1858 and S. 1929 Before the Communications Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. 96 (1959) (Statement of Comm'r Doerfer).
 
 
 55
 We also find petitioners' argument that the four exemptions were intended to be narrowly construed unsupported by the legislative history. Rather, we find more convincing the Commission's, and Aspen's, contention that the purpose of the 1959 amendment was broadly remedial, and evidenced a willingness by Congress to take some risks with the equal time philosophy in order to permit broadcast coverage of on-the-spot news and to enable broadcasters more fully to cover the political news.[18] Admittedly, Congress intended that the 1959 amendments would preserve the basic philosophy behind the equal time requirement.[19] At the same time, however, Congress was determined to increase broadcaster discretion and allow increased live broadcast coverage of political news. This was the tone set for the opening of the hearings on the proposed 1959 amendments by Representative Harris, the Chairman of the House Subcommittee on Communications and Power, when he stated:
 
 
 56
 This section (§ 315) by providing absolute equality among competing political candidates comes into conflict with two other worthy and desirable objectives:
 
 
 57
 First, the right of the public to be informed through broadcasts of political events; and
 
 
 58
 Second, the discretion of the broadcaster to be selective with respect to the broadcasting of such events.
 
 
 59
 Thus the principle of absolute equality for competing political candidates requires modification in the light of these two additional considerations and that is the specific problem which the Congress must face just how far the equality principle should give way to these other two principles. This question is to be developed in the course of these hearings.
 
 
 60
 Hearings on H.R. 5389, H.R. 5678, H.R. 6326, H.R. 7123, H.R. 7180, H.R. 7206, H.R. 7602, H.R. 7985 Before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. at 1-2 (1959) (Statement of Hon. Oren Harris, Chairman).
 
 
 61
 Nothing in the language of Section 315(a)(4) itself would indicate that debates or press conferences could not be considered "news events" worthy of coverage. On the contrary, the inherent newsworthiness of speeches and debates seems no greater or less than that of "political conventions and activities incidental thereto," events expressly within the scope of the exemption. It is indisputable that print media consider such events newsworthy.[20] We remain unconvinced by petitioners' arguments that these events are distinguishable based on the degree of control by the candidate, or the degree to which candidates tailor such events to serve their own political advantages. It is more reasonable to believe, as the Commission apparently does, that any appearance by a candidate on the broadcast media is designed, to the best of the candidate's ability, to serve his own political ends.[21] There is ample support in the legislative history for the Commission's conclusion that a candidate's partial control over a press conference or debate does not, by itself, exclude coverage of the event from Section 315(a)(4). This conclusion is consistent with the Commission's new position that, absent evidence of broadcaster intent to advance a particular candidacy, the judgment of the newsworthiness of an event is left to the reasonable news judgment of professionals.[22] See, e. g., National Broadcasting Company, 25 FCC 2d 735, 20 P & F Radio Reg.2d 301, 303 (1970); In re Complaint Covering CBS Program, "Hunger in America," 20 FCC 2d 143, 17 P & F Radio Reg.2d 674, 683 (1969); Thomas R. Fadell, 40 FCC 380, 381-382, 25 P & F Radio Reg. 288, aff'd per curiam sub nom., Fadell v. FCC, 25 P & F Radio Reg. 2063 (7th Cir. 1963).
 
 
 62
 Concurrently with the omission of the "incidental to" requirement from Section 315(a)(4),[23] Congress increased the scope of broadcaster discretion to determine whether a news event was "bona fide" and deserving of coverage. In the words of Chairman Harris,
 
 
 63
 Under the substitute agreed to in conference, the appearance of a candidate on a newscast or news interview will not be exempt from the equal time requirement unless the newscast or news interview is bona fide, and appearance of a candidate in on-the-spot coverage of news events is not to be exempt from the equal time requirements unless the program covers bona fide news events. This requirement regarding the bona fide nature of the newscast, news interview or news events was not included without careful thought by the conference committee. It sets up a test which appropriately leaves reasonable latitude for the exercise of good faith news judgment on the part of broadcasters and networks. . . .
 
 
 64
 105 Cong.Rec. at 17782 (1959) (emphasis added).
 
 
 65
 It is thus inescapable that the final bill provided more room for broadcaster discretion than the earlier version, which had retained the "incidental to" language. Whether broadcaster discretion was intended to be the sole criterion of the bona fide nature of a news event, absent a violation of the fairness obligation, is less certain, however, and we are unable to reach a definite conclusion from the legislative history. We note only that the thrust of the 1959 amendment was toward increasing broadcaster discretion to cover political news. We find the Commission's Opinion entirely consistent with this theme.
 
 
 66
 Based thus on the broad intent of Congress to maximize broadcast coverage of political events and to increase broadcaster discretion, as well as Congress' expressed willingness to take some risks with the equal time philosophy in order to achieve these goals and to grant the Commission some leeway in interpreting the exemptions, we conclude that the Commission's recent Opinion appears consistent with the general Congressional purpose expressed in the legislative history preceding the 1959 amendment.
 
 
 67
 B. Congressional Action and Inaction Subsequent to Passage of the 1959 Amendment
 
 
 68
 Petitioners argue that Congressional action after 1959 was consistent with their interpretation that Section 315(a)(4) was never intended to apply to debates or press conferences and, alternatively, that Congress ratified the Commission's original interpretation of the bona fide news event exemption and subsequently "reenacted" section 315 without modifying the news exemptions.
 
 
 69
 We turn first to petitioners' contention that the 1960 suspension of the equal time requirement in order to permit the so-called "Great Debates" between Democrat John F. Kennedy and Republican Richard M. Nixon evidenced a legislative recognition that debates were not exempt under the 1959 amendment. Brief for petitioners Chisholm and NOW at 40. We find no such indication. Senate Joint Resolution 207 suspended Section 315 in its entirety as it applied to all Presidential and Vice-presidential candidates; it never addressed the coverage of the 1959 amendments and placed no limits whatsoever on the kinds of events covered by broadcasters.[24] Such political programming took a variety of different forms, including some clearly not otherwise exempt from the equal time requirements. See Hearings Before the Communications Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 87th Cong., 1st Sess. 66 (1961). In fact, the Senate Report accompanying the Joint Resolution stated that one reason for the suspension was that the Commission had not yet had sufficient time to interpret the new exemptions; consequently, the across-the-board suspension was designed, at least in part, to provide time for necessary evaluation of the effects of the amendments. S.Rep. No. 1539, 86th Cong., 2d Sess. 2 (1960) (statement of Sen. Pastore). Given the scope of the Section 315(a) exemptions, especially their applicability to broadcast coverage of all 1960 election contests except the Presidential race and to all future contests as well, we must conclude that the 1960 suspension of Section 315 is more properly viewed as an isolated experiment in total repeal of the equal time requirements for Presidential and Vice-presidential candidates, and not as a recognition or limitation of the scope of the news coverage exemptions.[25]
 
 
 70
 Petitioners next argue that Congressional acquiescence in and affirmance of the Commission's prior interpretation of the "bona fide news event" exemption over a period of more than ten years demonstrates that the Commission's former interpretation was the correct one and, consequently, that the Wyckoff, Goodwill and Columbia Broadcast System decisions have taken on the force of law. Specifically, petitioners urge that Congress was aware of the Commission's interpretation and did not indicate disapproval. DNC Brief at 44-47. Petitioners then argue that this inaction ratified the Commission's 1962 decisions by acquiescence and, further, that the Federal Election Campaign Act of 1971 "reenacted" Section 315, thereby incorporating the Commission's interpretation into the Act such that it could be altered only by Congress. Brief for petitioners Chisholm and NOW at 65-66; DNC Brief at 44-51.
 
 
 71
 We begin by noting that attributing legal significance to Congressional inaction is a dangerous business. See, e. g., Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers, AFL-CIO, 367 U.S. 396, 408-10, 81 S.Ct. 1529, 1535-36, 6 L.Ed.2d 924, 932-33 (1961). The Supreme Court has said that Congressional failure to repudiate particular decisions "frequently betokens unawareness, preoccupation, or paralysis" rather than conscious choice, Zuber v. Allen, 396 U.S. 168, 185-86 n.21, 90 S.Ct. 314, 324, 24 L.Ed.2d 345, 356 (1969), and "affords the most dubious foundation for drawing positive inferences," United States v. Price, 361 U.S. 304, 310-11, 80 S.Ct. 326, 330, 4 L.Ed.2d 334, 339 (1960) (Harlan, J.).[26] See also Jones v. Liberty Glass Co., 332 U.S. 524, 533, 68 S.Ct. 229, 231, 92 L.Ed. 142, 149 (1947) ("The doctrine of legislative acquiescence is at best only an auxiliary tool for use in interpreting ambiguous statutory provisions"). On the other hand, the Court has recently stated that
 
 
 72
 (a) court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has reenacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.
 
 
 73
 NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134, 143 (1974) (citations omitted).
 
 
 74
 Petitioners argue that Congress acquiesced in the FCC's prior interpretation both actively and passively; "passively by not enacting legislation to correct it, and actively by, in effect, reenacting § 315 in 1972 by amendments in important particulars, without in any way changing the language of the statute here pertinent." DNC Brief at 19. The Commission's interpretation of the 1959 amendments, petitioners assert, "was well known and clearly understood by Congress in the ensuing decade." DNC Brief at 44.
 
 
 75
 Our examination of Congressional action subsequent to the enactment of the equal time exemptions reveals nothing that can be interpreted as active approval of the Commission's 1962 interpretation. Subsequent hearings concentrated more generally on proposals to abolish the equal time requirement altogether or to amend the law to permit studio debates or speeches, both non-exempt uses under either of the Commission's interpretations. Petitioners rely upon the fact that the Commission's decisions were reported to Congress and discussed, for example, in the Commission's Annual Reports to Congress and Equal Time Primer. DNC Brief at 44-46. Although this indicates that Congress was "aware" of the Commission's interpretation, at least in a technical sense, Congressional inaction in this instance is entirely consistent with the interpretation that Congress was willing to leave to the Commission the interpretation of the exemptions as they applied to specific program formats. In this sense, Congressional acquiescence in the Commission's interpretation does not indicate that it was the only, or the best, interpretation. The circumstances surrounding the reports themselves indicate that Congress had in no way adopted the Commission's interpretation as its own. For example, in the 1963 Hearings before the House Commerce Committee, FCC Chairman Minow cited the Brown-Nixon debate as an example of a close case in applying the Section 315(a) (4) exemptions and informed the Committee that the Commission had ruled that the debate did not qualify as a bona fide news event. In response, Chairman Harris strongly indicated his disagreement with the Commission's narrow interpretation of the "bona fide news event" exemption, stating:
 
 
 76
 Is not the bringing together of two major political candidates . . . a bona fide news event? Perhaps, I do not appreciate the definition of a bona fide news event. . . . Are we going to deprive the people under this strict interpretation which you suggest here, of the broadcastings of this event?
 
 
 77
 Political Broadcasts Equal Time Hearing Before the House Commerce Committee, 88th Cong., 1st Sess., 65-67 (1963), quoted in FCC Brief at 37. Certainly this statement is less consistent with ratification of the Commission's interpretation than with a willingness to allow the Commission some leeway in interpretation and application of the exemption to specific news-related formats. In short, under these circumstances, we believe that Congress' failure to overrule the Wyckoff, Goodwill and 1964 Columbia Broadcasting System decisions sheds little light on Congress' intent, other than to demonstrate adherence to the basic philosophy of the equal time requirement, since such inaction must be viewed against the background of Congress' decision to leave the Commission some discretion to decide which particular events should qualify for the broadly defined news coverage exemptions.[27]
 
 
 78
 Petitioners further contend that the Federal Election Campaign Act ("FECA"), 86 Stat. 3 et seq., reenacted Section 315, thereby positively approving the prior administrative construction. DNC Brief at 44-52; Brief for Chisholm and NOW at 65-67. We find this argument wholly unpersuasive. Although Congress did amend the Act in 1971 to include provisions relating to the cost of political advertising, 86 Stat. 4, 47 U.S.C. § 312(a)(7), the nature of the "reenactment" was extremely limited and concerned solely with reforming political campaign finance activities. The FECA amendments were in no way concerned with the equal time exemptions, and, in fact, by-passed Section 315(a) altogether. The doctrine of reenactment simply cannot be stretched this far. See generally Sutherland on Statutory Construction, §§ 22.08, 22.33 (1973).
 
 
 79
 The cases upon which petitioners rely for this contention are likewise distinguishable: all involved more specific reenactments or viewed Congressional acquiescence as but one of many factors in interpreting ambiguous statutory language. For example, in Helvering v. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1939), a case cited by petitioner DNC as "precisely dispositive," the Supreme Court held that the reenactment of the Revenue Acts without alteration indicated Congressional approval of the administrative construction of the Treasury Department; hence, the construction had attained the force of law. 306 U.S. at 114-15, 59 S.Ct. at 425, 83 L.Ed. at 540, cited in DNC Brief at 48. In that case, however, the specific statutory provision had been fully restated and repeatedly reenacted without change in each successive Revenue Act. Id. at 115 n. 10, 59 S.Ct. at 425, 83 L.Ed. at 540. Moreover, the Supreme Court has recognized the unique character of Internal Revenue Code cases due to the practice of Congressional amendment and reenactment. See Zuber v. Allen, supra, 396 U.S. at 185 n. 21, 90 S.Ct. at 323, 24 L.Ed.2d at 355. Similarly, in United States v. Leslie Salt Co., 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956), the Supreme Court refused to allow a new administrative definition of "debenture" to include certain promissory notes in the face of a consistent definition of 23-years duration. There, however, the Court based its decision largely on express Congressional approval of the old definition, since Congress had incorporated a similar definition into the statute by amendment, id. at 390-91, 76 S.Ct. at 420-21, 100 L.Ed. at 448, and since debentures and promissory notes had been taxed under separate provisions until the tax on promissory notes was repealed. Id. at 388-91, 76 S.Ct. at 419-21, 100 L.Ed. at 447-48. Finally, in Kay v. FCC, 143 U.S.App.D.C. 223, 443 F.2d 638 (1970), a panel of this court upheld the Commission's interpretation of Section 315 to apply separately to primary and general elections, so that during a primary election a broadcast "use" by a candidate gives rise to equal opportunities obligations only with respect to other candidates for his party's nomination. In Kay, however, the fact that Congress had amended Section 315 in 1959 without changing the language relied upon by the Commission was considered merely "an added circumstance which has some persuasive weight." Id. at 646. The Kay court specifically stated that legislative silence in the face of administrative interpretation does not necessarily indicate legislative approval. Id.[28]
 
 
 80
 We are thus unable to discover from the extensive, if rather ambiguous, legislative history any conclusive indication of a Congressional intent with respect to candidates' debates and press conferences. Congress' failure to take action in the face of the Commission's 1962 and 1964 decisions is subject to more than one interpretation. In the words of Judge Hand:
 
 
 81
 . . . (N)ot every ruling is incorporated in the text because it is not repudiated (by Congress); no one has ever suggested anything of the sort. At most, administrative practice is a weight in the scale, to be considered, but not to be inevitably followed. . . . To suppose that Congress must particularly correct each mistaken construction under penalty of incorporating it into the fabric of the statute appears to us unwarranted . . . .
 
 
 82
 F. W. Woolworth Co. v. United States, 91 F.2d 973, 976 (2d Cir. 1937), quoted in FCC Brief at 42.
 
 
 83
 Moreover, petitioners' acquiescence and reenactment arguments must be viewed in the context of the ability of administrative agencies to overrule past decisions,[29] particularly in light of the discretion traditionally afforded the Commission in interpreting and applying the equal time provision. Congress' failure to change the statute in the face of the Commission's interpretation is thus entirely consistent with a demonstrated willingness to allow the Commission some leeway in interpreting the news exemptions and in applying them to specific news-related events.
 
 
 84
 In these circumstances, we are in no position to say that the Commission has misinterpreted Congress' intent or usurped its authority. The Commission's Opinion is consistent with the broad Congressional purpose in enacting the 1959 exemptions permitting increased broadcaster discretion and encouraging greater coverage of political news and operates in an area where the Commission has been granted greater than normal discretion. We are therefore required to
 
 
 85
 defer to the Commission's interpretation. III. THE
 
 
 86
 PROCEDURAL ISSUE: THE PROPRIETY OF OVERRULING A
 
 LONGSTANDING ADMINISTRATIVE DECISION VIA
 DECLARATORY ORDER RATHER THAN
 THROUGH RULEMAKING
 
 87
 Finally, petitioners Chisholm and NOW argue that, even if the Commission had authority to change its interpretation of Section 315(a)(4) to include non-studio debates and candidates' press conferences, it was required to follow rulemaking procedures, including issuing formal public notice of the CBS and Aspen proposals and inviting public comment in conformance with the Administrative Procedure Act, 5 U.S.C. §§ 553, 706 ("APA") and the Due Process Clause of the Constitution. This is so, petitioners argue, because the Commission's Opinion enunciates new standards for determining what constitutes "on-the-spot coverage of bona fide news events" which are of general prospective application. Brief for petitioners Chisholm and NOW at 3-4.
 
 
 88
 We note initially that an administrative agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding. See, e. g., Automobile Club v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). See also American Trucking v. AT&S F.R. Co.,387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847, 860 (1967); NLRB v. A.P.W. Product Co., 316 F.2d 899 (2d Cir. 1963).
 
 
 89
 It is, of course, incumbent upon an agency reversing its own policy to provide "an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law." Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026 (1971). The Opinion, grounded in the Commission's interpretation of the legislative history of the 1959 amendment and in the broad Congressional intent to provide for increased news coverage of political news, satisfies this minimal standard and is in no other respect "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).
 
 
 90
 Respecting petitioners' claim that the Commission acted improperly in reversing precedent which has been followed for more than a decade via adjudication,[30] rather than through notice and comment rulemaking, we must differ with petitioners' reading of NLRB v. Bell Aerospace, supra. In Bell Aerospace, the Supreme Court held that the issue of whether certain buyers were managerial personnel, and thus exempt from the coverage of the National Labor Relations Act, need not be decided by rulemaking. That case, like this one, involved a ruling contrary to the agency's past decisions; yet, the Court held that the choice whether to proceed by rulemaking or adjudication is primarily one for the agency regardless of whether the decision may affect agency policy and have general prospective application. NLRB v. Bell Aerospace, supra, 416 U.S. at 291-95, 94 S.Ct. at 1770-72, 40 L.Ed.2d 134, 152-54. See also Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485, 508-13 (1970). See generally K. Davis, Administrative Law Treatise § 501 (1958 ed.). Bell Aerospace relied heavily on SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (Chenery II ), in which the Court had stated that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." Id. at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2002, quoted in NLRB v. Bell Aerospace, supra, 416 U.S. at 293, 94 S.Ct. at 1771, 40 L.Ed.2d at 153. Although the majority in Bell Aerospace indicated that there could be instances where reliance on adjudication rather than rulemaking would amount to an abuse of discretion, id. at 294, 94 S.Ct. at 1771, 40 L$Ed.2d at 153, we find nothing to indicate that this is such a case. The original interpretation of the 1959 exemptions, which the 1975 Opinion reversed, was also established by adjudication; thus reversal by adjudication seems particularly appropriate here.[31] Adjudicatory decisions do not harden into "rules" which cannot be altered or reversed except by rulemaking simply because they are longstanding.
 
 
 91
 Moreover, we see no advantage to be gained in this instance by requiring the Commission to proceed via the formalities of rulemaking rather than through adjudication. Petitioners DNC, Chisholm and NOW all submitted lengthy comments to the Commission in opposition to the Aspen and CBS petitions. As in Bell Aerospace, supra, we believe the issues were fully aired before the Commission, which had the benefit of all arguments raised before this court.[32] It is therefore difficult to see how requiring the Commission to go through the motions of notice and comment rulemaking at this point would in any way improve the quality of the information available to the Commission or change its decision. The only result would be delay while the Commission accomplished the same objective under a different label. Such empty formality is not required where the record demonstrates that the agency in fact has had the benefit of petitioners' comments. Cf. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 36, 405 F.2d 1082, 1104 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).
 
 
 92
 For these reasons, we see no procedural irregularity of any substance in the Commission's 1975 Opinion.[33] The Commission carefully studied the petitioners' arguments, both explicit in their written submissions and implicit in the Commission's own interpretations, the Wyckoff, Goodwill and Columbia Broadcasting System decisions, and rejected them in a well reasoned statement. The Commission thus satisfied the demands of the Administrative Procedure Act and the Due Process Clause.[34]
 
 IV. CONCLUSION
 
 93
 In conclusion, we find nothing in the Commission's Opinion inconsistent with the basic philosophy of Section 315 as amended in 1959. The 1959 amendment to Section 315 clearly limited to some extent the simple mechanistic application of that section. In creating a broad exemption to the equal time requirements in order to facilitate broadcast coverage of political news, Congress knowingly faced risks of political favoritism by broadcasters, and opted in favor of broader coverage and increased broadcaster discretion. Rather than enumerate specific exempt and non-exempt "uses," Congress opted in favor of legislative generality, preferring to assign that task to the Commission.
 
 
 94
 In attempting to implement the Congressional intent behind passage of the four news exemptions, the Commission has now reversed its prior interpretation and embarked on a new course which it believes to be more consistent with the letter and spirit of the 1959 amendment. According to our reading, the legislative history is inconclusive, but we find much support for the Commission's new interpretation. In these circumstances, we are obligated to defer to the Commission's interpretation, even if it is not the only interpretation possible. We find nothing in Congress' behavior since 1959, either active or passive, to indicate that the Commission's prior interpretation was necessarily correct, or that Congress adopted it. Moreover, we find no infirmity in the procedure by which the Commission changed its interpretation of the 1959 amendment, since the Commission was not required to proceed by rulemaking, and since nothing would be gained by requiring the Commission to so proceed. We reiterate that petitioners submitted lengthy comments to the Commission and advanced substantially all of the arguments advanced here. Finally, we note only in passing that this case involves issues in an intensely political area which this court enters with great reluctance. It is the job of the Commission in the exercising of its delegated authority, and ultimately of Congress, to make these kinds of front-line determinations. We find no basis for disturbing the Commission's action here, grounded as it is on the Commission's interpretation of Congressional intent, an interpretation which we find reasonable.
 
 
 95
 For the reasons stated herein, we affirm the Commission's Opinion. In so doing, however, we take comfort in the realization that Congress may correct the Commission if it has misinterpreted Congressional intent or overstepped the bounds of its discretion.
 
 
 96
 So ordered.
 
 
 97
 J. Skelly WRIGHT, Circuit Judge (dissenting):
 
 
 98
 In the recent past the Federal Communications Commission has repeatedly urged Congress to amend or repeal the "equal time" provision contained in Section 315 of the Communications Act.[1] The Commission's recommendation is based on its conclusion that Section 315, including the 1959 amendment, prevents the American people from receiving adequate broadcast coverage of political campaigns.[2] Congress, however, has not acted.
 
 
 99
 There is no indication that Congress' failure to act on the Commission's recommendations with respect to Section 315 is an inadvertence. From the very beginning of broadcasting in this country Congress has been aware of the potential of the new media to shape and influence public opinion, particularly in the political forum. To say that time has confirmed that judgment is to understate the obvious. To protect political candidates, local and national, from the danger of partisan use of the media as well as to protect the constitutional principle of electoral equality,[3] Congress inserted the equal time provision in its first major piece of legislation relating to broadcasting[4] and it has remained in the law to this day.
 
 
 100
 I do not doubt that the Commission's current position on Section 315 represents its best judgment of where the public interest lies, nor do I find the policy arguments in favor of the Commission's approach unconvincing. But sincere beliefs cannot substitute for a grant of authority, and frustration with the deliberateness of the legislative process cannot excuse failure to comply with the requisites of the administrative process. Cf. Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971), clarified, 149 U.S.App.D.C. 419, 463 F.2d 822 (1972). In this case I am convinced that the Commission, in rejecting its own prior opinions[5] as to the intent of Congress in passing the 1959 amendment to Section 315, has substituted its own judgment for decisions made by Congress, and has acted without regard for the procedures it was required to follow.
 
 
 101
 I. THE COMMISSION'S ACTION EXCEEDS ITS CONGRESSIONALLY
 
 DELEGATED AUTHORITY
 
 102
 As the majority emphasizes, the 1959 amendment to Section 315 was remedial legislation. It was not, however, broad remedial legislation. Rather, the 1959 amendment was intended principally to correct the Commission's decision in the Lar Daly case, Columbia Broadcasting System (Lar Daly ), 18 P & F Radio Reg. 238, reconsideration denied, 26 FCC 715, 18 P & F Radio Reg. 701 (1959).[6] See, e. g., 105 Cong.Rec. 14455 (1959) (remarks of Senator Pastore) ("Let us be positive about this. Generally all we are doing is restoring the situation insofar as news is concerned to that which existed for 32 years, before the Lar Daly decision."); id. at 16229 (remarks of Representative Harris) ("The Lar Daly decision abandoned this traditional concept and it is the primary purpose listen to me it is the primary purpose of this legislation to write back into section 315 this traditional exemption from the equal-time requirement and to deal with other things that always have been thought to be exempted from the equal-time requirement.").[7] Admittedly, the amendment was not strictly limited to overruling Lar Daly. It also covered
 
 
 103
 certain problems of electronic news coverage, involving the operation of section 315, other than those dealt with in the Lar Daly case, which should be cleared up by the Congress in this legislation simultaneously with the clarification of section 315 with respect to newscasts.
 
 
 104
 H.R.Rep. No. 802, 86th Cong., 1st Sess., 4 (1959). This congressional decision to resolve several specific problems[8] in one piece of amendatory legislation is not the same, however, as a decision to engage in a thorough reform of the legislative framework. The 86th Congress explicitly rejected efforts at such restructuring of the equal time provision.[9]
 
 
 105
 Since Congress sought to restore what it considered a workable status quo ante rather than to create a new equal time provision with unknown parameters, the legislators had a clear understanding of both the types of political broadcasts that definitely were not to be affected by the new exemptions and the intended role of the Commission in administering the amended section.[10] Shortly after passage of the 1959 amendment the Commission in a series of opinions[11] had no trouble finding the clear intent of Congress not to include debates and press conferences within the exemptions. Congress, for over a decade, acquiesced in that judgment.[12] But now, using the same legislative history 15 years after the fact,[13] the Commission has reversed itself, finding that Congress did indeed intend to allow debates and press conferences in the exemptions after all. I submit that the Commission was right when it read the legislative history the first time.
 
 
 106
 A. The Exemption of Debates and Press Conferences
 
 
 107
 1. Debates. (a) The Senate in 1959. When the Communications Subcommittee of the Senate Committee on Interstate and Foreign Commerce met to consider a legislative response to the Lar Daly decision, it had four bills before it. Two of those bills would have exempted from the equal time requirement candidate appearances on news shows, panel discussions, debates, and "similar type programs."[14] The other two bills would have excluded from Section 315 only "any news program, including news reports and news commentaries, where the format and production of the program are determined by the broadcasting station * * *."[15] Much of the discussion during the committee hearings focused on establishing the differences between these two approaches and on determining what could be broadcast free of equal time obligations under the different formulations. The committee was told that the proposals restricted to exemption of news programs would not allow broadcast of debates between candidates.[16] Whether debates ought to be exempted was recognized as a major issue before the committee.[17]
 
 
 108
 The committee drafted its own bill, combining the approaches in the proposed bills, for submission to the full Senate. The committee's bill, S. 2424, exempted from Section 315(a) the "(a)ppearance by a legally qualified candidate on any news(cast), news interview, news documentary, on-the-spot coverage of news events, or panel discussion * * *." S.Rep. No. 562, 86th Cong., 1st Sess., 1 (1959), U.S.Code Cong. & Admin.News 1959, p. 2564. An exemption for debates, after having been fully considered by the committee,[18] was not recommended to the Senate.[19]
 
 
 109
 On the floor of the Senate the committee's bill was presented and discussed as a measure designed primarily to reverse the Lar Daly decision by exempting news programs from Section 315.[20] Senator Engle, however, objected that by including panel discussions among the exemptions the bill went too far beyond simply restoring the pre-Lar Daly understanding of the equal time requirement.[21] He therefore moved to eliminate the words "or panel discussions" from the bill. His argument to the Senate was that an exemption for panel discussions, like the exemption for debates already rejected by the committee, would pose too great a danger of abuse of the broadcast media.[22]
 
 
 110
 The only strong opposition to Senator Engle's amendment was voiced by Senator Javits.[23] He identified panel discussions with face-to-face debate among candidates, urging retention of the exemption for panel discussions because of the importance of such debate to the political process:
 
 
 111
 Mr. President, I think a word needs to be said about panel discussions, which are really an integral part of the American process of debate. Before we vote on the amendment, I would like to state that it should not be adopted. I think we should preserve panel discussions, and not make the requirement ridiculous. I refer to the opportunity of Americans to hear face-to-face debate by opponents. * * *
 
 
 112
 Let us not be wearing blinkers in terms of problems we face in daily decisions, but let us realize the broad public interest which is inherent in panel discussions.
 
 
 113
 Mr. President, I repeat, we are venturing into an area where we are trying to change a situation which has proved to be embarrassing. In the haste of trying to do something about that situation, let us not eliminate what I consider to be one of the great capabilities of the American people for having a knock-down, drag-out, face-to-face debate, to wit, a panel discussion which can do them the most good.
 
 
 114
 105 Cong.Rec. 14452-14453 (emphasis added).[24] Despite this plea from Senator Javits, Senator Engle's amendment was accepted on a voice vote and the exemption for panel discussions was eliminated from S. 2424. Id. at 14453.
 
 
 115
 Thus both the committee and the full Senate considered whether to include in the amendment to Section 315 an exemption for debates between candidates. Both the committee and the full Senate determined that such an exemption was not warranted. The clear basis for the full Senate's action was a belief that an exemption for panel discussions, viewed by its one proponent as including debates between candidates, would unduly expand the scope of S. 2424 beyond reversing the Commission's action in Lar Daly. In concluding that candidates' debates are bona fide news events within the meaning of Section 315(a)(4), the Commission has ignored the Senate's decision that such debates should not be freed of the equal time requirement.
 
 
 116
 (b) The House in 1959. Like its Senate counterpart, the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce considered a range of proposals for amending Section 315 following the Lar Daly decision. A proposed "Fair Political Broadcasting Act of 1959" would have exempted from the equal time requirement appearances by a candidate "on any regularly scheduled or bona fide newscast, news documentary, panel discussion, debate, or similar type program * * *."[25] The bill also contemplated significant additional changes in Section 315.[26] Another proposal was simply to exempt appearances "on any news program, including news reports and news commentaries * * *."[27] H.R. 7985, introduced by the subcommittee chairman, Oren Harris, took a middle position. Under that bill, which was ultimately reported by the committee to the full House, candidate appearances "on any news, news interview, news documentary, on-the-spot coverage of newsworthy events, panel discussion, or similar type program * * * " were excluded from the coverage of Section 315.[28] All of the bills specified that to be eligible for exemption a program must be under the exclusive control of the broadcaster.
 
 
 117
 Chairman Harris opened the hearings by describing the three categories of bills to be considered. When explaining his own bill he listed the exemptions it would establish, noting that for on-the-spot coverage of newsworthy events he "ha(d) in mind such events as national conventions of political parties." After this listing he stated, "I did not include the word 'debate,' in H.R. 7895 because I think that has connotations which go far beyond matters of this kind." Hearings on H.R. 5389 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess., 2 (1959) (hereinafter House Hearings). Later in the first day of the hearings Representative Harris again stated the reason for his decision not to include an exemption for debates:
 
 
 118
 This bill (H.R. 7895) has been changed from H.R. 6810, 84th Congress, in only one respect. That is the word "debate" has been stricken out. As a (sic) said earlier, that was done purposely because I am not sure just how you could ever define what a debate is so that a broadcast station or the Federal Communications Commission could follow it in its interpretation if we used that broad term.
 
 
 119
 Id. at 87-88.
 
 
 120
 As in the Senate committee, much of the questioning of the various witnesses was directed to developing an understanding of the extent of the proposed exemptions. Thus Representative Harris elicited from the president of the National Broadcasting Company that the exemption for coverage of newsworthy events would include such events as political conventions and the opening of a Russian exhibit attended by the President and Vice President of the United States. Id. at 87, 89. This interpretation of the language he had drafted was satisfactory to Representative Harris. See id. at 102. No one ever suggested that candidates' debates, if held outside a broadcast studio, might be "newsworthy events" within the intent of the bill. By contrast, the testimony and questioning of FCC Commissioner Ford, who unsuccessfully proposed an exemption for coverage of "special events," clearly established that the author of that language intended to include debates between candidates.[29] E. g., id. at 93, 100.
 
 
 121
 Following testimony of members of the Federal Communications Commission, the committee heard from several witnesses who supported broad exemptions from the equal time provision. Virtually every one of these witnesses, when comparing the proposals before the committee, identified failure to include debates as a key weakness of the Harris bill.[30] The committee heard vigorous advocacy of the value of political debates as a means of informing the electorate about the candidates, and of the need for an exemption to allow broadcasters to bring debates to the public.[31] The only reaction to these pleas was the expression of concern by committee members that inclusion of a wide range of program types in the exempt categories would leave little vitality in the equal time requirement and give broadcasters too much discretion.[32] Not one member of the committee suggested that debates might be exempt under the Harris proposal.[33]
 
 
 122
 The committee adhered to the decision made by Representative Harris and reported to the full House a bill which did not include an exemption for debates.[34] Discussion on the floor of the House contains no suggestion on the part of any representative that debates were excluded from the equal time provision. The Commission, however, contends that none of this history demonstrates that Congress intended that debates between candidates be subject to the equal time requirement:
 
 
 123
 * * * During the House of Representatives' floor debate, Congressman Harris noted that a number of important program categories were not specifically exempted from Section 315, but then he made the following observation:
 
 
 124
 "On the other hand, and I want you to get this, . . . the elimination of these categories by the committee was not intended to exclude any of these programs if they can be properly considered to be newscasts or on-the-spot coverage of news events."
 
 
 125
 105 Cong.Rec. 16229 (August 18, 1959). This view is consistent with the legislative history as to the other news exemptions as well.
 
 
 126
 Aspen Institute Program on Communications, 55 FCC 2d 697, 705, 35 P & F Radio Reg.2d 49, 60, JA 141, 153 (emphasis added) (hereinafter Aspen ). See also majority op. at n.17; FCC br. at 24-25.
 
 
 127
 Representative Harris' statement cannot bear the weight the Commission places on it, for it has no reference to debates. The paragraphs immediately preceding the paragraph which the Commission and its supporters have chosen to quote make clear that Representative Harris was referring, not to debates, but to news documentaries and panel discussions:
 
 
 128
 The Subcommittee on Communications and Power discussed the various bills at considerable length in executive session, and reported to the full committee H.R. 7985, but limited the exemption to newscasts (including news interviews) and on-the-spot coverage of newsworthy events.
 
 
 129
 In other words, Mr. Chairman, the Subcommittee and the full committee decided to eliminate as separate categories news documentaries, panel discussions, and similar type programs as such. The committee felt with which I agreed that these categories are simply too vague and cannot be defined with sufficient definiteness.
 
 
 130
 105 Cong.Rec. 16229 (emphasis added). See also id. at 17782.[35]
 
 
 131
 (c) Summary of 1959 Legislative History. Both the Senate and the House committees considered bills which would have exempted candidates' debates from the equal time provision. Both committees heard vigorous testimony about the value and importance of providing an exemption for debates. Both committees refused to do so. On the floor of the House no one suggested that debates were or should be included within the exemptions. On the floor of the Senate an exemption permitting debates was eliminated by voice vote. I submit that this history shows a clear congressional intention, based on full consideration of the question, not to allow broadcast of candidates' debates free of the requirement that equal time be provided to all legally qualified candidates. Congress intended this legislative history to serve as the authoritative guide for the Commission.[36] By substituting its own judgment for the clear mandate of Congress as shown by the legislative history, the Commission has claimed power it does not possess.
 
 
 132
 (d) Subsequent Legislative History. The parties before us have extensively one might even say exhaustively briefed and argued the significance properly attributable to congressional action and inaction regarding Section 315 subsequent to the 1959 amendment. The Commission and its supporters, as well as the division majority, cite cases that warn against over-reliance on legislative proceedings subsequent to enactment of the law whose interpretation is at issue.[37] Petitioners and their supporters point to cases that place great weight on such subsequent events.[38] In view of the clarity of congressional purpose I find in the history of the 1959 amendment itself, I see no need to attempt to formulate a general theory of the importance of subsequent legislative history. It is, however, clear that in appropriate circumstances[39] the action and inaction of a later Congress can be "an added circumstance which has some persuasive weight * * * ," Kay v. FCC, 143 U.S.App.D.C. 223, 231, 443 F.2d 638, 646 (1970), with regard to the intended meaning of a statute. Since circumstances in this case are appropriate for according at least "some persuasive weight" to events after 1959,[40] I will briefly consider later congressional treatment of Section 315(a).
 
 
 133
 Both sides attach the greatest importance to interpreting the action of the second session of the 86th Congress the Congress which wrote the 1959 amendment in suspending Section 315(a) for the 1960 presidential campaign.[41] See S.J.Res. 207, 86th Cong., 2d Sess. (1960) (Pub.L. No. 86-677, 74 Stat. 554). Petitioners maintain that since the purpose of this suspension was to allow the "Great Debates" between Democrat John F. Kennedy and Republican Richard M. Nixon, passage of the Joint Resolution constitutes an authoritative congressional declaration that debates were not exempted by the 1959 amendment.[42] The Commission's response, accepted by the majority here, is twofold. First, the Commission argues that "the 1960 legislation had no special relevance to the coverage of debates (since t)he legislation was intended to apply to any appearance by the Presidential candidates regardless of format (.)" 55 FCC 2d at 706, 35 P & F Radio Reg.2d at 60, JA 153 (emphasis in original). See majority op. at ---- of --- U.S.App.D.C., at 360-361 of 538 F.2d. Second, the Commission contends that Congress enacted the suspension because the Commission had not yet acted "to clarify the meaning of the exemptions." 55 FCC 2d at 706, 35 P & F Radio Reg.2d at 60, JA 154. See majority op. at ---- of --- U.S.App.D.C., at 360 of 538 F.2d.
 
 
 134
 Neither of these arguments can withstand examination. Although it is true that the 1960 suspension did not specify that debates must be held, it is also clear that debates were expected to be one result of the Joint Resolution. See 106 Cong.Rec. 14473 (1960) (remarks of Senator Pastore); id. at 17036-17037 (remarks of Representative Harris); id. at 17039 (remarks of Representative Springer). Moreover, the broadcasters told Congress they could not practicably present debates unless Section 315 were suspended, and Congress acted on that basis. See S.Rep. No. 1539, 86th Cong., 2d Sess., 3-5 (1960); 106 Cong.Rec. at 14473 (statement of Senator Pastore); id. at 17037 (remarks of Representative Harris); id. at 17039 (remarks of Representative Springer). That the suspension additionally allowed programs other than debates, or that programs already exempt under the 1959 amendment were also presented, does not affect the validity of the inference, clearly supported by the legislative history of the suspension provision, that Congress believed suspension of Section 315(a) was necessary to allow broadcast of debates between the two major candidates for the presidency.
 
 
 135
 The Commission's second argument depends on its assertion that when Senator Pastore said, "Not enough time has elapsed to permit full evaluation of (the 1959) amendment," he meant to say that the Commission had not yet had time to define the scope of the exemptions. I see nothing in the context[43] or wording of Senator Pastore's remarks to support this interpretation of his statement. The majority, apparently recognizing this difficulty, rewords the argument:
 
 
 136
 * * * (T)he Senate Report accompanying the Joint Resolution[44] stated that one reason for the suspension was that the Commission had not yet had sufficient time to interpret the new exemptions; consequently, the across-the-board suspension was designed, at least in part, to provide time for necessary evaluation of the effects of the amendments.
 
 
 137
 Majority op. at ---- of --- U.S.App.D.C., at 360 of 538 F.2d. In addition to misstating the Senate report,[45] this revised version is illogical: suspension of the entire equal time provision for presidential candidates would not facilitate evaluation of the impact of amendments which created some exemptions to that provision.
 
 
 138
 I therefore conclude, as the Commission itself concluded in its prior opinions,[46] that the 1960 suspension of Section 315(a) provides additional evidence that the 86th Congress believed that debates were not exempted from the equal time requirement by the 1959 amendment.[47] Later Congresses also appear to have shared this understanding of Section 315(a). However, in view of the length of this dissent and of the cumulative nature of the support to be drawn from the post-1960 history, I will rest on the citations to the legislative history in the margin.[48]
 
 
 139
 2. Press Conferences. In contrast to its explicit concern with candidates' debates, the 86th Congress did not focus on press conferences when considering the 1959 amendment. The absence of discussion of press conferences in the 1959 legislative history[49] does not, however, mean that the Commission is free now, particularly after its long-standing decision to the contrary and its repeated subsequent unsuccessful efforts to have Congress change Section 315, to determine that candidates' press conferences, as such,[50] are bona fide news events which may be broadcast free of equal time obligations under Section 315(a)(4). To the contrary, I am convinced that candidates' press conferences were not discussed by Congress in 1959 because they are so clearly within the core of Section 315's purpose a purpose reaffirmed in 1959 that the possibility that they might or should be exempted by the amendatory legislation was not deemed worthy of mention. Cf. NLRB v. Bell Aerospace Co., 416 U.S. 267, 283-284, 94 S.Ct. 1757, 1766, 40 L.Ed.2d 134, 147-148 (1974).[51] By holding otherwise the Commission has exceeded the limits of the authority delegated to it by Congress.
 
 
 140
 The central purpose of Section 315 is to assure that if one candidate is allowed to use the public airwaves as a platform from which he can plead for votes, all other legally qualified candidates will receive an equal opportunity to use that singularly effective platform.[52]
 
 
 141
 (T)he fundamental objective of (Section 315) was to require any licensee who had allowed any legally qualified candidate to use his facilities to afford equal opportunity to all other candidates for that same office. Its basic purpose was to require equal treatment by broadcasters of all candidates for a particular public office once the broadcaster made a facility available to any one of the candidates. This was a sound principle and the committee reemphasizes its belief in that objective. * * *
 
 
 142
 S.Rep. No. 562, supra, at 8, U.S.Code Cong. & Admin.News 1959, p. 2571. Congress recognized that broadcast facilities can be made available to a candidate although they are not formally placed under his control by being sold or donated to him.[53] The clearest example of such a "use" of broadcast facilities, mentioned in the legislative history only to illustrate the type of event definitely not affected by the 1959 amendment, is when a station on its own broadcasts a set political stump speech or a staged political event.[54] Press conferences, which can be opened with an uninterrupted statement of any length the candidate chooses and which can be used to deliver pre-rehearsed "answers" to selected questions,[55] are within this clearly nonexempt category.
 
 
 143
 Differentiating between set political speeches and staged political events, on the one hand, and "bona fide news events," on the other, is a task which could, of course, become difficult at the margins. Congress did, however, identify factors which should be considered when determining on which side of the line a particular event, or type of event, falls. Consideration of those factors demonstrates that candidates' press conferences do not present a close question.
 
 
 144
 To distinguish "an outright political speech or political appearance the candidate made," Hearings Before the Communications Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 1585, 86th Cong., 1st Sess., 219 (1959) (remarks of Senator Pastore), from an event which could be broadcast without providing equal opportunities to other candidates, Congress focused on two aspects of the event. The first consideration is the degree to which the event is staged by the candidate:
 
 
 145
 It is natural that during campaign periods political candidates will do their best to see to it that incidents in their campaigns, including speeches, are news and thus are covered by all important news media. However, as a matter of principle, it is not the intention of the committee that staged incidents or stump speeches be considered "news" within the context of this legislation.
 
 
 146
 H.R.Rep. No. 802, supra, at 6.[56] An alternative although not precisely complementary manner of expressing this aspect of the inquiry is to consider the extent to which the format and content are under the control of the broadcaster. The legislative history contains many references to this formulation.[57] The second distinguishing element identified by Congress is the purpose of the event and the candidate's appearance at it. If the event is designed to improve the candidate's chances, and the candidate's appearance is thus for the purpose of furthering his candidacy, it is unlikely that the event is bona fide news.[58]
 
 
 147
 Both the Commission and the majority find these factors unhelpful and therefore reject their relevance. Their argument is premised on the observation that candidates hope and expect that their chances will be improved whenever they are seen or heard on a broadcast,[59] and that the content and format of a political convention, explicitly defined as a "bona fide news event" in the 1959 amendment, are not within the control of the broadcaster. They also note that a candidate's acceptance speech is obviously intended to further the candidacy being accepted. Majority op. at ---- of --- U.S.App.D.C., at 358-359 of 538 F.2d and n.22; 55 FCC 2d at 705 n.10, 35 P & F Radio Reg.2d at 59 n.10, JA 152 n.10. Based on these observations, they conclude that Congress could not have meant the factors discussed above to control the determination whether an event is a "bona fide news event."
 
 
 148
 This argument incorporates a crucial non sequitur : because neither factor can serve as a litmus test for distinguishing all exempt events from all nonexempt events, the Commission and the majority conclude that neither consideration, evaluated in isolation or together, is of any value. Yet it is simply not true that, because a candidate hopes to be assisted by any broadcast appearance, inquiring whether the event is created for that purpose and whether the candidate's participation in it is an element of the campaign will be of no assistance. For example, the incumbent candidates who participated in the nationally broadcast inquiry into the impeachment of President Nixon can be assumed to have hoped that their positions and performances would aid their campaigns. Yet the impeachment inquiry[60] can be readily distinguished from a campaign event by noting that it served a purpose independent of any campaign and that, whatever their hopes, the incumbent candidates' appearances were part of their legislative duties.[61]
 
 
 149
 Similarly, the degree of candidate control, while not always decisive, can serve as a useful guide to classifying events. For example, although the content and format of the impeachment inquiry were not determined by or under the control of the broadcasters, neither was the inquiry under the control of any candidate.[62] This factor thus helps distinguish the impeachment hearings from the stump speech, the paradigm of the nonexempt event. The same observation can be made for most aspects of a political convention.[63]
 
 
 150
 The inadequacy of the majority's analysis is also demonstrated by consideration of the "common sensical point of view" it substitutes for the criteria identified by Congress. Majority op. at note 20. This approach, which is what the Commission's rationale reduces to, notes that "the inherent newsworthiness of speeches and debates seems no greater or less than that of 'political conventions and activities incidental thereto,' " citing as proof the coverage of such events by the print media. Id. at ---- of --- U.S.App.D.C., 358 of 538 F.2d. Such reasoning ignores the House committee's decision to substitute the phrase "news events" for the phrase "newsworthy events" because the latter wording "might result in a greater weakening of the equal-time requirement than would be desirable."[64] More importantly, as the majority apparently recognizes and accepts,[65] use of this "common sensical" standard would allow broadcast, free of the equal time requirement, of any of a major candidate's vote-seeking activities. It is certainly true that print and broadcast journalists accompany the leading candidates for high office, especially if the incumbent is among them, wherever they go and whatever they do.[66] Likewise, the visit of such a candidate, and especially of an incumbent, would almost certainly be considered a local happening of great importance and interest.[67] Thus, under the approach adopted by the Commission and ratified by the majority, a broadcaster whose motivation was not partisan could provide live coverage of all of a candidate's local handshaking and speechmaking and not be subject to the equal time requirement.
 
 
 151
 Congress did not intend to open such a broad gap in the coverage of the equal time provision.[68] To avoid doing so it created exemptions to Section 315 which were "restricted * * * to well defined categories(,)" 105 Cong.Rec. 14440 (remarks of Senator Pastore), and it set forth criteria by which the content of those categories could be determined. The criteria to be used for determining whether an event is a "bona fide news event" within the meaning of Section 315(a)(4) are control and purpose. As to the former the candidate alone determines the timing, duration, format, and to a large degree the content[69] of a press conference. As to the latter the press conference is a part of the campaign, used to solicit votes, through the press, from a wider electorate than the candidate can reach through personal campaigning. Thus consideration of the criteria identified by Congress reveals that a candidate's press conference closely resembles a stump speech;[70] as such, it is a staged political event, not a "bona fide news event," and it is not within the fourth exemption to the equal time requirement of Section 315.[71]
 
 
 152
 3. Conclusion. The Commission now argues, contrary to its prior opinions, that all of this legislative history is irrelevant. It claims that the failure to include references to debates and panel discussions in the 1959 amendment as enacted shows only that "(t)he committees chose to focus on general types of news coverage rather than attempt to draft a specific list of particular events which might qualify as exempt."[72]
 
 
 153
 This argument is untenable.[73] The language of Section 315(a)(4) specifies both a type of coverage on-the-spot and a type of event bona fide news events. Congress devoted a great deal of effort to considering what a bona fide news event would be.[74] This consideration, which was expected to guide the Commission's administration of the 1959 amendment,[75] resulted in a deliberate congressional decision to leave candidates' debates subject to the equal time rule. It also provided guidelines for distinguishing "staged political events" from "bona fide news events." The Commission has no right to disregard these congressional determinations.
 
 B. The Delegation to the Broadcasters
 
 154
 Although the Commission has, in terms, limited its declaratory order, Aspen establishes a new standard for determining whether a broadcast in which a candidate appears is within the 1959 amendment's exemptions from the equal time requirement. That standard effectively makes the broadcaster the judge of the reach of the equal time obligation:
 
 
 155
 * * * Congress intended that the Commission would determine whether the broadcaster had in such cases made reasonable news judgments as to the newsworthiness of certain events and of individual candidacies and had afforded major candidates broadcast coverage. Conference Report, H.Rep.No.1069, 86th Cong., 1st Sess.[76]
 
 
 156
 55 FCC 2d at 705, 35 P & F Radio Reg.2d at 59, JA 153 (emphasis in original).[77] The Commission's review, under this standard, is extremely limited:
 
 
 157
 The Commission reviews only whether or not the broadcaster intends to promote the interest of a particular candidate in presenting coverage of a news event.
 
 
 158
 55 FCC 2d at 711 n.19, 35 P & F Radio Reg.2d at 66 n.19, JA 161 n.19. Thus, so long as the licensee cannot be shown[78] to have decided to broadcast a particular event for the purpose of advancing a candidate's interest, he is free[79] to choose to broadcast any political event he wishes[80] with no obligation to provide equal time to opposing candidates. As the Commission recognized in its earlier decisions, this approach to Section 315(a)(4) would render meaningless the other three exemptions in Section 315(a) and "would also largely nullify the objectives of Section 315 * * *." National Broadcasting Co. (Wyckoff), 40 FCC 370, 371, 24 P & F Radio Reg. 401, 402 (1962).
 
 
 159
 (I)f we were to construe subsection (a)(4) as encompassing all coverage of a candidate deemed newsworthy by the licensee, it would mean that the equal opportunities requirement of Section 315, in effect, had been repealed that the licensee, in the exercise of his good faith news judgment, could cover the speeches, press conferences, indeed any and all appearances of a candidate, without bringing into play the equal opportunities requirement. * * *
 
 
 160
 Columbia Broadcasting System, Inc., 40 FCC 395, 398, 3 P & F Radio Reg.2d 623, 627-628 (1964).
 
 
 161
 I believe it is clear that Congress, in enacting the 1959 amendment to Section 315, had no intention of establishing exemptions from the basic principle of equal time definable only in terms of the judgment of the broadcasters.[81] As I have demonstrated, the legislators engaged in extensive discussions of whether particular types of activities would fall within the proposed exemptions to the equal time requirement. See Part I-A supra. The purpose of these discussions was not only to educate the legislators about the measure they were considering, but also to establish guidelines for the Commission's administration of the revised Section 315.[82] This effort to explain to the Commission the intended content of the exemptions, including that for "bona fide news events," would make no sense if Congress intended that the definition of a bona fide news event was to be left in the hands of the interested broadcaster. Indeed, Congress explicitly rejected making broadcaster judgment even an aspect of the definition of a bona fide news event. As the Senate Report explained, one of the bills before the committee contained a provision
 
 
 162
 limiting the exempted programs to those where a broadcaster was required to act in good faith in determining what was a newsworthy event and in no way designed to advance the cause of or discriminate against any candidate.
 
 
 163
 The committee was impressed by this approach and intended to adopt similar language in reporting legislation. However, the Federal Communications Commission urged this committee to eliminate any such provision on the ground that it would lead to protracted litigation as to what constitutes news, news interviews, news documentaries, and on-the-spot coverage of news events or panel discussion. Indeed, the Federal Communications Commission, in its letter dated July 2, 1959 * * *, stated:
 
 
 164
 "It would be much better for the Commission to cope with a single problem of developing interpretations as to what constitutes 'news, news interviews, news documentary, on-the-spot coverage of newsworthy events, panel discussions, or similar type program' without being required to determine the merits of a defense that even though not a newscast, etc., the broadcaster in good faith intended it to be a bona fide newscast."
 
 
 165
 In view of the fact that the Federal Communications Commission is charged with the responsibility for administering this legislation, the committee acceded to its wishes.
 
 
 166
 S.Rep. No. 562, supra, at 11-12, U.S.Code Cong. & Admin.News 1959, pp. 2573-2574 (emphasis added).[83] See also H.R.Rep.No. 802, supra, at 13 (committee substituted words "news events" for words "newsworthy events" in introduced bill because the latter language "was unnecessarily vague and might result in a greater weakening of the equal-time requirement than would be desirable."). Thus by adopting a standard which makes "broadcaster discretion * * * the sole criterion of the bona fide nature of a news event," majority op. at ---- of --- U.S.App.D.C., 360 of F.2d 538, the Commission has taken a position in conflict with its own advice, which was accepted by the draftsmen of the 1959 amendment in order to avoid writing vague, open-ended exemptions into the equal time requirement.
 
 
 167
 Moreover, Congress intended the guidance it strove to provide in the legislative history to be used by the Commission as it filled in the details of the statutory scheme:
 
 
 168
 (T)he committee has acted very wisely, I think, in not legislating here in complex detail. Instead there is entrusted to the Federal Communications Commission responsibility for issuing detailed rules and regulations to implement the legislative intent.
 
 
 169
 105 Cong.Rec. 16227 (remarks of Representative Celler) (emphasis added). See also id. at 16234 (remarks of Representative Avery) (committee has shown the House "certain basic guidelines that should direct the rulemaking of the Federal Communications Commission to the end that is sought and was accepted in the industry before the Lar Daly decision."). The committee report and debate in the Senate also emphasized the responsibility of the Commission to establish detailed regulations which would implement the intent of Congress. See page ---- of --- U.S.App.D.C., pages 390-391 of 538 F.2d infra. Indeed, the statute itself specifically recognizes the important role of the Commission in implementing the equal time provision. See id.; majority op. at ---- of --- U.S.App.D.C., at 356-357 of 538 F.2d. The Commission's sweeping delegation of authority to the broadcasters is facially inconsistent with this congressional intention that the Commission would answer all "questions arising under the provisions of this bill and relating to the details concerning programs exempt from the operation of section 315(a)." S.Rep. No. 562, supra, at 12-13, U.S.Code Cong. & Admin.News 1959, p. 2575 (emphasis added); see page ---- of --- U.S.App.D.C., 390 of 538 F.2d infra.
 
 
 170
 The Commission's action will also frustrate the clearly expressed congressional intention to maintain close oversight of the implementation and impact of the 1959 amendment. Section 2(a) of the 1959 amendment itself, Pub.L. No. 86-274, 73 Stat. 557, declares that Congress intends to reexamine the amendment to Section 315(a) "to ascertain whether such amendment has proved to be effective and practicable." Section 2(b) of the amendment seeks to facilitate this congressional oversight by requiring the Commission to report annually on its administration of the amendment. See page ---- of --- U.S.App.D.C., page 391 of 538 F.2d infra. The promise of vigilant and effective oversight was one of the primary assurances supporters of the 1959 amendment offered those who feared any alteration of the equal time requirements.[84]
 
 
 171
 This congressional concern is easy to understand. As elected politicians the members of Congress have from the beginning been especially sensitive to the political potential of the broadcast media.[85] From their own experiences they know its power.[86] Although Lar Daly made clear the need for introducing some flexibility into Section 315, the 86th Congress determined to supervise the uses to which that flexibility would be put.
 
 
 172
 The Commission's adoption of a standard of broadcaster discretion for defining the scope of Section 315(a)(4) renders effective congressional supervision impossible. As of June 30, 1973 there were 8,676 licensed radio and television stations in the United States. Federal Communications Commission, 39th Annual Report/Fiscal Year 1973 at 192. Obviously, Congress cannot meaningfully review the actions of all of these stations. Yet since the Commission itself will be concerned only with objective evidence of broadcaster bad faith, Congress will have to consider the actions of the individual broadcasters if it wishes to determine whether the 1959 amendment, as administered, is "effective and practicable."[87] Thus, by delegating to broadcasters the function Congress assigned to it, the Commission has displaced Congress from the supervisory role it reserved for itself in the 1959 amendment to Section 315.
 
 
 173
 In the face of this congressional intent evidenced in the statute itself as well as in the legislative history for the Commission to retain control of implementation of the 1959 amendment, the Commission and the majority point to two aspects of the legislative history to support delegation of authority to broadcasters. The point most relied on is the refusal of the conference committee to accept a provision of the House bill which restricted the exemptions to candidate appearances "incidental to" presentation of other news. See 55 FCC 2d at 703-705 & n.9, 35 P & F Radio Reg.2d at 56-59 & n.9, J.A. 150-153 & n.9; majority op. at ---- of --- U.S.App.D.C., at 359-360, of 538 F.2d.
 
 
 174
 I cannot agree that this action requires, or even authorizes, the Commission to adopt a standard of deference to good faith broadcaster judgment. Since the Senate bill contained no "incidental to" restriction, the conference committee's action is best interpreted as merely adopting the Senate's view of the appropriateness of such a test. As I have shown above, the Senate, which was greatly concerned with maintaining effective congressional oversight, intended the Commission to involve itself with the details of the exemptions and specifically rejected use of a test relying on broadcaster judgment.[88] Moreover, Representative Bennett, the leader of the opposition to the "incidental to" test, explained that he feared the test would be confusing and impractical. See 105 Cong.Rec. at 16241-16242; id. at 17778. He did not indicate that the problem with the test was that it unduly restricted the broadcasters, nor did he suggest that deleting the "incidental to" language would be desirable because it would make broadcaster judgment decisive. Any such suggestion would have been startling since during the committee hearings Representative Bennett had repeatedly expressed his belief that the broader proposals being considered would place too much discretion in the hands of the broadcasters. See House Hearings, supra, at 80-82, 142-143, 189-193.[89]
 
 
 175
 The Commission also relies on the legislative history's references to the increased role for broadcaster discretion created by the 1959 amendment. These references, however, simply indicate congressional recognition that if a program is within one of the exempt categories, the broadcaster's discretion will govern its use or nonuse of that program. There is no indication that broadcaster judgment is to be the determinant of whether a program or type of program falls within one of the exempt categories. Rather, it is for the Commission as it did wrongly, I submit, in this case to indicate the types of broadcasts included in each statutory exemption so the broadcasters may then exercise their discretion in handling programs of those types.[90]
 
 
 176
 Thus nothing in the legislative history supports the standard the Commission has adopted. To the contrary, the legislative history indicates that Congress rejected incorporating broadcaster judgment in the definition of the exemptions. Rather, Congress intended the Commission to retain control over implementation of the 1959 amendment and to concern itself with "the details concerning programs exempt from the operation of section 315(a)."[91] The reason for this congressional decision to locate decision-making authority in the Commission rather than among the 8,676 broadcasters is also clear: Congress wished to assure its own ability to supervise administration of the amendment. Since Aspen's standard undermines that ability by redelegating the responsibility imposed on the Commission, we can uphold the law written by Congress only by rejecting the opinion written by the Commission.
 
 
 177
 II. THE COMMISSION FAILED TO COMPLY WITH THE ADMINISTRATIVE
 
 PROCEDURE ACT
 
 178
 This controversy was initiated when the Aspen Institute Program on Communications and Society (Aspen) and Columbia Broadcasting System, Inc. (CBS) petitioned the FCC to issue declaratory rulings reversing prior Commission decisions under Section 315. Aspen's petition, filed April 22, 1975, asked the Commission to overrule two prior decisions[92] and hold that joint appearances of political candidates may be covered as "bona fide news events."[93] The CBS petition was filed July 16, 1975. That petition, which also asked the Commission to overrule an earlier decision,[94] sought a declaration that presidential press conferences could be broadcast live as "on-the-spot coverage of bona fide news events."[95]
 
 
 179
 The Commission never published formal notice of the existence of either petition. Nevertheless, petitioners here became aware[96] of the Aspen and CBS requests and filed comments with the Commission. These comments both opposed the substance of the proposed restructuring of Section 315 doctrine and urged the Commission to proceed by rule making if it wished to make such major prospective changes in existing law.[97] Other interested groups also filed short statements requesting that the Commission act by rule making to provide opportunity for public participation and to assure that such important matters of public concern would not be decided without full consideration of the many substantial questions involved.[98] Despite these requests, the Commission did not initiate a rule-making proceeding. Instead it adopted the opinion challenged in this action on September 25, 1975. In that opinion the Commission noted that although Aspen and CBS had requested declaratory rulings and were therefore the only parties formally before the Commission, the objections of petitioners here had been "fully considered." 55 FCC2d at 703 n.8, 35 P & F Radio Reg.2d at 56 n.8, JA 149 n.8.
 
 
 180
 I agree with petitioners that this truncated form of proceeding, involving no formal notice and opportunity to comment,[99] is inadequate in these circumstances, and that the Commission should have followed the informal rule-making procedures of Section 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1970). But even if the Commission could properly institute these changes by adjudication, as it claims to have done, its decision is still required to comply with "the 'simple but fundamental rule of administrative law,' * * * that the agency must set forth clearly the grounds on which it acted." Atchison, Topeka & S.F. R. Co. v. Wichita Board of Trade, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350, 361 (1973), quoting SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947). For it is only on those grounds that the Commission's action can be judicially reviewed. SEC v. Chenery Corp. (Chenery I), 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The Commission has not satisfied this most basic requirement of administrative law.
 
 
 181
 A. The Need for Informal Rule-Making Procedures
 
 
 182
 1. The Choice Between Adjudication and Rule Making. The Commission maintains that its opinion is a declaratory order, an adjudication under Section 5 of the APA, 5 U.S.C. § 554(e) (1970), and that it is authorized to issue such an order by that statute and by Section 1.2 of its regulations, 47 C.F.R. § 1.2 (1975). Although I believe the Commission's authority to issue a declaratory order in these circumstances is questionable at best,[100] I will assume here that the Commission has properly characterized its action. The remaining question is whether the Commission had authority to proceed by adjudication rather than by rule making in this case. I conclude that the Commission did not have that authority.
 
 
 183
 The Commission and the majority, relying primarily on the recent Supreme Court decision in NLRB v. Bell Aerospace Co., supra, conclude that the Commission's choice may be supported by reference to the generally broad discretion allowed administrative agencies in deciding whether to act by adjudication or rule making. 55 FCC2d at 712 n.20, 35 P & F Radio Reg.2d at 67 n.20, J.A. 161 n.20; majority op. at ---- of --- U.S.App.D.C., at 364-365 of 538 F.2d. But in Bell Aerospace the Court held merely that in deciding whether the buyers who worked for a particular employer were managerial employees the NLRB was free to proceed by adjudication.[101] The Court expressly reserved the question whether the Board would have to use rule making to adopt a new general standard for determining when an employee is a managerial employee. 416 U.S. at 291-292, 94 S.Ct. at 1770, 40 L.Ed.2d 152; Chisholm br. at 7-8. In the context of this case Bell Aerospace leaves open the question whether the Commission "should have resorted to rulemaking, or in fact improperly promulgated a 'rule,' " 416 U.S. at 291, 94 S.Ct. at 1770, 40 L.Ed. at 152, when it held that all candidate debates and press conferences are exempt under Section 315(a)(4) from the equal time requirement and that henceforth good faith broadcaster judgment would determine the extent of Section 315(a)(4). Moreover, the Bell Aerospace Court noted that even when considering a narrow question such as the status of particular employees "there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act * * *." Id. at 294, 94 S.Ct. at 1771, 40 L.Ed.2d at 153. For the reasons explained below, I conclude that even if this case involved only a narrow ruling by the Commission[102] it is one of those exceptional "situations" where rule making is required. These same reasons compel the conclusion that the question reserved in Bell Aerospace should be answered affirmatively here.
 
 
 184
 Two parts of the equal time statute require this case to be treated as an exception to the general rule of administrative discretion. First, the Communications Act commands that "(t)he Commission shall prescribe appropriate rules and regulations to carry out the provisions of this (equal time) section." 47 U.S.C. § 315(d) (Supp. IV 1974) (emphasis added). A similar provision has been in the law since the equal time requirement was first enacted in the Radio Act of 1927. Act of Feb. 23, 1927, ch. 169, § 18, 44 Stat. 1170. Its originator explained that the purpose of the rule-making provision was to allow the Commission to fill in the details necessarily omitted from the legislative language. 67 Cong.Rec. 12503 (1926) (remarks of Senator Dill). This purpose was reaffirmed in 1959:
 
 
 185
 The committee wants to make it clear that * * * the committee fully intends for the Commission to exercise the rulemaking authority in section 315((d)) on questions arising under the provisions of this bill and relating to the details concerning programs exempt from the operation of section 315(a).
 
 
 186
 S.Rep. No. 562, supra, at 12-13, U.S.Code Cong. & Admin.News 1959, p. 2575.[103] Accordingly, Senator Pastore told his colleagues:
 
 
 187
 What is a newscast? We are saying to the Commission, "Tell us what it is, and make rules and regulations, so that all may know."
 
 
 188
 What is a news documentary? We say to the Commission, "Define it by rules and regulations."
 
 
 189
 The Commission is obliged under the bill to promulgate rules and regulations which will define a newscast, a news documentary, and on-the-spot news coverage.
 
 
 190
 * * * (T)he Commission is duty bound under this amendment by rule and regulation to tell us exactly what is meant by a newscast, a news documentary, and on-the-spot news coverage.
 
 
 191
 105 Cong.Rec. 14455-14456 (emphasis added).
 
 
 192
 If the only purpose of this emphasis on rule making were assuring that all interested parties receive notice of the Commission's understanding of the exemptions, the procedure the Commission followed in this case would suffice. However, Congress intended the Commission to write rules as an exercise of its expert judgment, based on the specialized knowledge of broadcasting it possesses and on additional information it could obtain from the public through rule making.[104] S.Rep. No. 562, supra, at 12. The Commission's action here does not fulfill this congressional expectation.[105]
 
 
 193
 The second part of the statute that distinguishes this case from situations governed by the general rule recognized in Bell Aerospace is Section 2 of the 1959 amendment. To facilitate the oversight promised in Section 2(a), see page 44, supra, Section 2(b) requires that
 
 
 194
 the Federal Communications Commission shall include in each annual report it makes to Congress a statement setting forth (1) the information and data used by it in determining questions arising from or connected with such amendment, and (2) such recommendations as it deems necessary in the public interest.
 
 
 195
 (Emphasis added.) Thus Congress assumed that the Commission would follow information-generating procedures when ruling on at least the most important questions to arise under Section 315(a). Only by so doing would the Commission provide Congress with the basis for exercising informed oversight.
 
 
 196
 The Commission's primary response to the suggestion that it should have conducted a rule-making proceeding to gain information relevant to its decision is that
 
 
 197
 it would have been useless for the Commission to seek comments on whether, for policy reasons, it should or should not apply correctly the rules of statutory construction to the cases which it overruled. Clearly, the Commission has a duty to correct its mistakes in legal interpretation.
 
 
 198
 FCC br. at 48 n.26; see id. at 46 n.22a, 49, 52. As I demonstrate below, see Part II-B infra, and as the majority tacitly recognizes,[106] this characterization misrepresents what the Commission actually did. In addition, the Commission suggests that since it confined its action to overruling prior cases it was acting on "a preexisting record which stipulated critical facts * * *." FCC br. at 49 n.28. Again, this statement misrepresents the Commission's action since Aspen not only ruled on the eligibility of candidates' debates and press conferences for exemption under Section 315(a)(4) but also established a new standard for determining the extent of that section. Moreover, even if the Commission had not promulgated a new standard its holding would not have been limited to the "critical facts"[107] of its earlier cases. The 1964 decision on press conferences, Columbia Broadcasting System, Inc., supra, 40 FCC 395, 3 P & F Radio Reg.2d 623, considered only the press conferences of incumbent Presidents and candidates for the presidency. Aspen covers candidates for all offices, national and local.
 
 
 199
 This is not an insignificant extension. The impact of the Commission's action on coverage of thousands of candidates in local races, where the broadcasters' actions may be less controlled by fear of adverse public reaction to favoritism, is an important consideration when evaluating the wisdom of the Commission's new policy. Similarly, the Commission could usefully have sought to educate itself about the effect of establishing broadcaster judgment as the governing criterion for the Section 315(a)(4) exemption on the ability of political minorities to participate effectively in the political process.[108] Finally, even if consideration of all the relevant information led the Commission to conclude that it ought to adopt a policy of deference to broadcaster judgment, the information obtained in a rule-making proceeding would allow formulation of appropriate guidelines for exercise of that discretion.[109] Although in the absence of notice no local political parties or groups submitted any comments to the Commission, we cannot assume that no such group has anything valuable to contribute.[110]
 
 
 200
 I therefore conclude that there are many areas of inquiry where more information would have aided the Commission's decision making. This conclusion, combined with the congressional emphasis on rule making, the relationship between rule making and congressional oversight, and the fact that the Commission has reversed its prior long-standing precedents in a most important and sensitive area of its statutory responsibility, leads me to believe that even if the rule of Bell Aerospace is applicable here the Commission should have acted by promulgating a rule. Moreover, the general nature of the Commission's holdings that broadcaster good faith determines the scope of Section 315(a)(4) and that all nonstudio debates and press conferences held by candidates fall within that section convinces me that this case raises the question explicitly left undecided in Bell Aerospace. I have no doubt that the proper answer to that question, in these circumstances, is to require the Commission to utilize the rule-making procedures designed "for formulating, amending, or repealing * * * an agency statement of general * * * or particular applicability and future effect * * *." 5 U.S.C. §§ 551(5), 551(6) (1970).
 
 
 201
 2. The Need for Rule-Making Procedures. The Commission also maintains that its summary action in this case can be properly characterized as a rule making rather than an adjudication, but notice and comment procedures were not required because the rule is interpretative. FCC br. at 50-52; see 5 U.S.C. § 553(b) (1970). To a large extent this contention is based on the Commission's belief, discussed above, that rule-making proceedings involving notice and comment would be of no use. The Commission also argues that since it is merely interpreting Section 315(a)(4) the result is an interpretative rule.
 
 
 202
 The distinction between an interpretative rule, exempt from the notice and comment requirements of Section 4 of the APA, and a legislative rule, to which those requirements apply, is often tenuous. See, e. g., National Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 696 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). No talismanic factor has emerged from the cases or the commentary as a guide for puzzled courts, and the last section of a lengthy dissent is no place to assay a definitive resolution of the riddle. Therefore, without attempting to establish a general formula for detecting legislative rules although they are labeled interpretative, I will simply identify three aspects of this proceeding which support the conclusion that the Commission's new approach to Section 315(a)(4) is not merely an interpretation.
 
 
 203
 First, and according to Professor Davis most importantly, 1 K. Davis, Administrative Law Treatise § 5.03 at 302 (1958), the Commission has been issued a specific grant of legislative rule-making power in this area. Moreover, Section 315(d) of the Communications Act, as well as the legislative expressions of intent discussed in Part II-B-1 supra, make clear that this specific grant is also a broad grant.[111] The Commission was directed to use that legislative rule-making authority, among other purposes, "to define a newscast, a news documentary, and on-the-spot news coverage" 105 Cong.Rec. 14456 (remarks of Senator Pastore).
 
 
 204
 A related consideration in determining whether a rule is legislative or interpretative is the impact of the rule in later actions. If a rule is interpretative it does not foreclose challenge in a plenary proceeding before the agency itself, see National Ass'n of Insurance Agents, Inc. v. Board of Governors, 160 U.S.App.D.C. 144, 146-147, 489 F.2d 1268, 1270-1271 (1974), or in court, see, e. g., Pacific Gas & Electric Co. v. FPC, 164 U.S.App.D.C. 371, 375 n.14, 506 F.2d 33, 37 n.14 (1974) (dictum); American President Lines, Ltd. v. FMC, 114 U.S.App.D.C. 418, 421, 316 F.2d 419, 422 (1963); 1 K. Davis, supra, at § 5.04. In this case, however, there is no indication that the Commission considers its conclusion anything but final, or that it will be willing in the future to entertain Section 315 complaints regarding debates or press conferences in the absence of evidence of broadcaster bad faith. Contrast National Ass'n of Insurance Agents, Inc. v. Board of Governors, supra. Since the Commission is the important enforcement forum given the delay inherent in judicial review, the Commission's attitude alone requires that this rule be deemed legislative. Moreover, as the majority's willingness to defer even when the Commission claims not to have exercised either discretion or special expertise indicates, judicial review of the Commission's handling of Section 315 complaints is likely to be substantially less than plenary.
 
 
 205
 Finally, courts should consider the impact of a rule in the instant case before classifying it as interpretative. American Bancorporation, Inc. v. Board of Governors, 509 F.2d 29, 33 (8th Cir. 1974); Hou Ching Chow v. Attorney General, 362 F.Supp. 1288, 1292 (D.D.C.1973); Pharmaceutical Manufacturers Ass'n v. Finch, 307 F.Supp. 858, 863 (D.Del.1970); National Motor Freight Traffic Ass'n v. United States, 268 F.Supp. 90, 95-96 (D.D.C.1967) (three-judge court) (McGowan, J.), affirmed, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); see Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 482 (2d Cir. 1972). There can be no question that this rule, which substantially alters the rights of all candidates for political office anywhere in the country, has a widespread and significant impact. This impact is, of course, heightened by the practical importance of the Commission in the enforcement process. Even if judicial review of Section 315 rulings were plenary and rapid, the practical difference between having the Commission defend in court its ruling in behalf of a candidate seeking equal time and requiring that candidate to go to court against the Commission is obviously substantial.
 
 
 206
 These factors can all be incorporated into an analysis which looks to the purpose of the APA. If a rule has a substantial impact on its own, and especially if that rule relies on a source of administrative authority that assures limited judicial review, it should not be exempted from the notice and comment provisions of Section 4. "(T)hat very quality of importance to the industry and to the public is what lies at the base of Section 4 of the APA and which informs the Congressional purpose in that law to expose proposed agency action by general rule to the test of prior examination and comment by the affected parties." National Motor Freight Traffic Ass'n v. United States, supra, 268 F.Supp. at 96. Accord, Pharmaceutical Manufacturers Ass'n v. Finch, supra, 307 F.Supp. at 863. The Commission's ruling placing discretion in this important political area in the hands of broadcasters is too important to the American people for it to have been made by the commissioners alone and uninformed of the public interest in the various parts of this country.
 
 
 207
 B. The Inadequacy of the Commission's Explanation
 
 
 208
 Aspen's rationale is that the Commission in its previous decisions had "relied on a mistaken interpretation of law," that it had misread the intent of Congress, by finding candidates' debates and press conferences not "incidental to" presentation of news and therefore outside the scope of Section 315(a)(4).[112] I have explained in Part I supra my reasons for concluding that the Commission, on this second time around, has dramatically misread the intent of Congress. At this stage of the argument the more important point is that my colleagues in the majority are also unable to find the "compellingly clear" legislative history on the basis of which the Commission has reversed its long-standing precedents. Thus the majority opinion states only that the legislative history of the 1959 amendment provides "inconclusive" support for the Commission's interpretation. Majority op. at ----, ---- of --- U.S.App.D.C., 356, 357 of 538 F.2d.[113] On the crucial question of "(w)hether broadcaster discretion was intended to be the sole criterion of the bona fide nature of a news event, absent a violation of the fairness obligation," the majority is "unable to reach a definite conclusion from the legislative history." Id. at ---- of --- U.S.App.D.C., 360 of 538 F.2d.
 
 
 209
 The majority attempts to bridge this gap between what it can find in the legislative history and the basis on which the Commission claims to have acted by referring to the deference due an administrative agency's discretion in construing its governing statute. Id. at ----, ---- of --- U.S.App.D.C., 357, 364 of 538 F.2d; see, e. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 383 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965) (dictum). I question whether deference to the administrative statutory interpretation is appropriately granted to the Commission's reversal of its long-standing construction of Section 315(a)(4), particularly where the court itself finds the legislative history inconclusive.[114] But even if deference is warranted, the Commission here did not choose one of many permissible constructions as an exercise of its discretion.[115] Instead it claimed to be under the compulsion of a clear legislative mandate.
 
 
 210
 This case, then, falls squarely within the holding of Chenery I, supra. There the Securities and Exchange Commission claimed to have acted under the direction of legal precedent. The Court concluded that the cited precedent did not govern the SEC's action and, although it recognized that the SEC might have been able to take the same action as an exercise of its discretion, refused to affirm on grounds other than the basis on which the SEC had acted. Here the majority agrees with me that the binding legislative history which the Commission gives as the reason for its action does not exist. Therefore, assuming arguendo that the new approach to Section 315(a)(4) is within the Commission's delegated authority, we should refuse to affirm the Commission's holding as an exercise of discretion in the absence of an administrative opinion that recognizes and explains the basis of its choice.
 
 III. CONCLUSION
 
 211
 The Commission's ruling exempting debates and press conferences is contrary to the intent of Congress in passing the 1959 amendment. Most importantly, as the Commission itself held in the cases it is now reversing,[116] affirming the Commission's action in this case effectively repeals Congress, venerable equal time legislation. The Commission concedes that under its ruling broadcasters may now pick and choose as to which candidates' press conferences and which candidates' debates they will put on the air without restraint from the equal time law. The Commission argues, however, that its ruling is limited to debates and press conferences. But its ruling was so limited only because it was a response to similarly limited petitions. There is simply no principled way to hold that debates and press conferences are covered by the 1959 exemption to the equal time law if considered newsworthy by the broadcaster in the exercise of its good faith judgment without also holding that other partisan political efforts made by a candidate for office, including speeches, are also covered. As the Commission said, first time around:
 
 
 212
 * * * (I)f we were to construe subsection (a)(4) as encompassing all coverage of a candidate deemed newsworthy by the licensee, it would mean that the equal opportunities requirement of Section 315, in effect, had been repealed that the licensee, in the exercise of his good faith news judgment, could cover the speeches, press conferences, indeed any and all appearances of a candidate, without bringing into play the equal opportunities requirement. But Congress clearly intended, with four exceptions, to retain that requirement to, as Chairman Harris stated, "limit carefully the exceptions from Section 315" (105 Cong.Rec. 17778). * * *
 
 
 213
 Columbia Broadcasting System, Inc., supra, 40 FCC at 398, 3 P & F Radio Reg.2d at 627-628.
 
 
 214
 Proper deference to the Commission's expertise cannot insulate this exercise in administrative arrogation of power from judicial review. The Commission has not relied on its discretion, nor has it complied with the procedures designed by Congress to assure that discretion is wisely used. Instead the Commission has based its reversal of settled law on a highly selective reading of the legislative history, the same legislative history it used to establish the settled law. Surely in these circumstances we should heed the Supreme Court's warning that "(t)he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855, 867 (1965).
 
 
 215
 I respectfully dissent.
 
 
 
 [1]
 Section 315(a) of the Communications Act of 1934, Act of June 19, 1934, ch. 652, § 315, 48 Stat. 1088, was identical to Section 18 of the Radio Act of 1927, Act of February 23, 1927, ch. 169, § 18, 44 Stat. 1170
 
 
 [2]
 The ruling under review is set forth at 55 FCC 2d 697 (1975); J.A. 141 (hereinafter referred to as Opinion )
 
 
 [3]
 47 U.S.C. § 315(a)(4) (1959)
 
 
 [4]
 Daly, a perennial candidate in both the Republican and Democratic mayoralty primaries in Chicago, had complained that several stations presented newsclips showing the mayoralty candidates in the two primaries but refused to afford him equal time. The Commission ruled that the presentation of these filmclips constituted a "use" of the broadcast facility and, consequently, that Daly was entitled to equal time
 
 
 [5]
 Congress' concern was that rigid application of Section 315 to broadcast coverage of political news would act as a deterrent to any coverage of political news at all. This concern was voiced in the Report of the Senate Committee on Interstate and Foreign Commerce, recommending the passage of the bill which was finally enacted, as follows:
 The inevitable consequence (of the FCC's rigid interpretation) is that a broadcaster will be reluctant to show one political candidate in any news-type program less he assumes the burden of presenting a parade of aspirants.
 S.Rep. No. 562, 86th Cong., 1st Sess. 9 (1959), U.S.Code Cong. & Admin.News 1959, p. 2571.
 
 
 [6]
 J.A. 22. The Federal Election Campaign Act Amendments of 1974, 26 U.S.C. §§ 9032(6), 9037, encourage early declarations by candidates for the Presidency by making matching public funds available
 
 
 [7]
 In this regard, it is interesting to note the large number of candidates for the Presidency in recent elections, both serious and "fringe." The Federal Election Commission has published a listing of some 52 Presidential and Vice-presidential candidates on whose behalf reports have been filed during 1975. See 40 Fed.Reg. 49682, 49684-89 (Oct. 23, 1975). In 1960, there were at least 8 candidates, in 1968, there were 14, and in 1972, there were 11. CBS Brief at 42, citing America Votes 10, A Handbook of Contemporary American Election Statistics (R. Scammon, ed. 1973)
 
 
 [8]
 The Commission reaffirmed its 1964 holding that press conferences cannot be considered exempt as "bona fide news interviews" under Section 315(a)(2). Opinion, para. 31-35; J.A. 157-59
 
 
 [9]
 H.R.Rep. No. 806, 86th Cong., 1st Sess. (1959)
 
 
 [10]
 if the sole test of the on-the-spot coverage exemption is simply whether or not the station's decision to cover the event and to put it on a broadcast program constitutes a bona fide news judgment, there would be no meaning to the other three exemptions in § 315(a) since these, too, all involve a bona fide news judgment by the broadcaster. Carried out to its logical conclusion, this approach would also largely nullify the objectives of § 315 to give the public the advantage of a full, complete, and exhaustive discussion, on a fair opportunity basis, to all legally qualified candidates and for the benefit of the public at large
 
 
 [40]
 FCC at 398 (footnotes omitted)
 
 
 [11]
 47 U.S.C. § 315(a)(3), not relevant here, explicitly retains the "incidental to" requirement
 
 
 [12]
 See the statement of Rep. Bennett of Michigan, 105 Cong.Rec. 16241. At the floor discussion of the bill following deletion of the "incidental to" provision, Bennett stated: "I am glad to see that the conference substitute omits this language because the majority of conferees felt as I do, that this requirement would lead to even greater confusion than we have at present under the Lar Daly decision." Id. at 17778
 
 
 [13]
 Rep. Moss, who had drafted the "incidental to" language, dissented from the conference report and during floor debate circulated a letter detailing his reasons. Rep. Bennett responded as follows:
 I feel that this language ("incidental to the presentation of news") would make the task of broadcasters and the FCC an impossible one and that even with the best intentions in the world neither broadcasters nor the Commission can meet the task of distinguishing between appearances which are incidental and appearances which are not incidental.
 
 
 [105]
 Cong.Rec. 17778
 
 
 [14]
 The Commission determined that the same rationale applied with respect to press conferences, stating that, "(P)ress conferences do not lose their exemption merely because the candidate's appearance is the central aspect of the news event." 55 FCC 2d at 708, para. 30; J.A. 157. In this regard, the Commission declined to adopt CBS's rationale which would have distinguished between Presidential and other press conferences based on the "unique status of the Presidency and the inherent newsworthiness of Presidential communications with the public." Id. at 711, para. 39; J.A. 161
 
 
 [15]
 By order dated October 17, 1975, No. 75-1994 (DNC) was consolidated with No. 75-1951 (Rep. Chisholm and NOW)
 
 
 [16]
 105 Cong.Rec. 14451 (1959) (remarks of Sen. Holland). See also 106 Cong.Rec. 13424 (1960) (Sen. Pastore)
 
 
 [17]
 In drafting the exemptions, the Senate and House Committees drew from a number of proposed bills, including S. 1585, S. 1604, S. 1858, S. 1929, H.R. 7122, H.R. 7180, H.R. 7216, H.R. 7602, H.R. 7985, 86th Cong., 1st Sess. (1959). The final version did not include earlier proposals to enumerate specific exempt events, such as debates or panel discussions. See, e. g., the Hartke bill (S. 1858). The elimination of such specific formats, however, was not intended to exclude them if they could qualify under one of the general categories of news coverage in the final bill. Oren Harris, Chairman of the House Committee and the bill's floor manager, stated:
 (T)he elimination of these categories by the committee was not intended to exclude any of these programs if they can be properly considered to be newscasts or on-the-spot coverage of news events.
 
 
 [105]
 Cong.Rec. 16229 (August 18, 1959). See also id. at 17782 (Sept. 2, 1959) (remarks of Rep. Harris)
 In short, in the final version of the bill, Congress opted for exemptions based on general categories relating to news coverage, rather than on specific program formats, and this of necessity left the Commission with the task of deciding which particular events could qualify within the limits of the statutory language. Id. at 17778 (Sept. 2, 1959) (remarks of Rep. Harris). This is also clear from the language of Section 315(a)(4), "(including but not limited to political conventions and activities incidental thereto) . . . " (emphasis added).
 
 
 [18]
 The Senate Report stated that, "The public benefits are so great that they outweigh the risk that may result from the favoritism that may be shown by some partisan broadcasters." S.Rep. No. 562, 86th Cong., 1st Sess. 10 (1959), U.S.Code Cong. & Admin.News 1959, p. 2572
 
 
 [19]
 A careful examination of the legislative history of Section 315 of the Communications Act and its predecessor, Section 18 of the Radio Act of 1927, reveals clearly that the fundamental objective of that statute was to require any licensee who had allowed any legally qualified candidate to use his facilities to afford equal opportunity to all other candidates for that same office. Its basic purpose was to require equal treatment by broadcasters of all candidates for a particular public office once the broadcaster made a facility available to any one of the candidates. This was a sound principle and the committee reemphasizes its belief in that objective
 Id. at 8, U.S.Code Cong. & Admin.News 1959, p. 2570 (emphasis added), quoted in Brief for petitioners Chisholm and NOW at 27 n.4.
 
 
 [20]
 It seems beyond dispute, from a commonsensical point of view, that the Presidential press conference is an important news event. Such conferences are regularly printed in the newspapers indeed, the New York Times regularly prints a transcript of each Presidential press conference. See generally Morgan, Ways, Mollenhoff, Lisagor and Klein, The Presidency and the Press Conference (1971); Strout, LBJ Meets the Press . . . Sort of, 154 New Republic 13 (1966). The networks regularly have covered Presidential press conferences in their entirety since they first became available in the mid 1950's. In this regard, NBC notes in its brief that since 1955 it has carried more than 100 Presidential news conferences, almost all those available. NBC Brief at 35
 Debates between major candidates are also "news" in this respect. We do not understand petitioners to contend, for example, that the Nixon-Brown debate at issue in the Wyckoff decision was not newsworthy. They contend rather that the event derived its newsworthiness from the appearances of the candidates themselves and not from some independently newsworthy event and, hence, would have given rise to equal time obligations.
 
 
 [21]
 The Commission's Brief states at 25-26:
 In keeping with the focus on the type of news coverage of events rather than the events themselves, Congress chose to determine the bona fides of coverage by looking at the intent of the broadcaster rather than at the intent of the candidate . . . since a candidate always intends to advance his candidacy.
 
 
 [22]
 Indeed, the Lar Daly case, the event which was responsible for the passage of the news exemptions, is in point. There Congress expressly overruled the Commission's holding that news coverage of a mayor's airport greeting of a foreign dignitary and his opening of a charity drive constituted a use of the broadcast media entitling all other mayoral candidates to equal time. At least with respect to the charity drive, the event can be deemed newsworthy only because of the mayor's appearance, and the appearance was certainly under his control. Similarly,
 (i)n the case of political conventions the respective political parties largely control whether, in what capacity, and to what extent a particular political candidate shall participate in the convention; and the broadcaster exercises his news judgment primarily with respect to whether or not he will provide on-the-spot coverage of a particular political convention, and, if so, what parts. . . .
 H.R.Rep. No. 802, 86th Cong., 1st Sess. 7 (1959).
 
 
 [23]
 We note that the 1959 amendment to Section 315 retained the "incidental to" test in the definition of a "bona fide news documentary" as a compromise between the Senate bill, which had excluded documentaries, and the House bill, which had not. See H.R.Conf.Rep. No. 1069, 86th Cong., 1st Sess. 4, printed at 105 Cong.Rec. 17777 (1959)
 
 
 [24]
 Senate Joint Resolution 207 provided:
 Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That that part of section 315(a) of the Communications Act of 1934, as amended, which requires any licensee of a broadcast station who permits any person who is a legally qualified candidate for any public office to use a broadcasting station to afford equal opportunities to all other such candidates for that office in the use of such broadcasting station, is suspended for the period of the 1960 presidential and vice presidential campaign with respect to nominees for the offices of President and Vice President of the United States. Nothing in the foregoing shall be construed as relieving broadcasters from the obligation imposed upon them under this Act to operate in the public interest.
 (2) The Federal Communications Commission shall make a report to the Congress, not later than March 1, 1961, with respect to the effect of the provisions of this joint resolution and any recommendations the Commission may have for amendments to the Communications Act of 1934 as a result of experience under the provisions of this joint resolution.
 P.L. 86-677, 74 Stat. 554.
 
 
 [25]
 This interpretation is also consistent with the reporting provision in subsection (2) of the Joint Resolution, supra
 
 
 [26]
 In Zuber v. Allen, the Court went on to state:
 "It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law." Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946). Its significance is greatest when the area is one of traditional year-by-year supervision, like tax, where watchdog committees are considering and revising the statutory scheme. Even less deference is due silence in the wake of unsuccessful attempts to eliminate an offending interpretation by amendment. . . . Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence, let alone . . . approval . . . . 396 U.S. at 186 n.21, 90 S.Ct. at 324, 24 L.Ed.2d at 356 (emphasis added).
 
 
 [27]
 See discussion in Part IIA of this opinion
 
 
 [28]
 In Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), cited in Kay v. FCC, supra, the Supreme Court stated:
 (I)n the absence of any persuasive circumstances evidencing a clear design that congressional inaction be taken as acceptance of (an earlier decision), the mere silence of Congress is not a sufficient reason for refusing to reconsider the decision.
 398 U.S. at 241-42, 90 S.Ct. at 1587, 26 L.Ed.2d at 205.
 
 
 [29]
 See generally K. Davis, Administrative Law Treatise § 17.07 (1965)
 
 
 [30]
 The declaratory ruling belongs to the genre of adjudicatory rulings. See Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485 (1970)
 
 
 [31]
 The views expressed in Chenery II and Wyman-Gordon make plain that the Board (the NLRB) is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion. 416 U.S. at 294, 94 S.Ct. at 1771, 40 L.Ed.2d at 153
 
 
 [32]
 Petitioner DNC filed a 25-page letter with the Commission in opposition to the CBS petition. J.A. 45. Petitioners Chisholm and NOW also commented on the CBS and Aspen petitions in a 46-page document submitted by the Media Access Project ("MAP"). MAP offered further comments on the proposals in a second 13-page document. These documents contain substantially the same arguments advanced in this appeal
 
 
 [33]
 Petitioners Chisholm and NOW further contend that the Commission has violated its own regulations which provide that it "may, in accordance with section 5(d) of the Administrative Procedure Act (5 U.S.C. § 554(e)), on motion or on its own motion issue a declaratory ruling terminating a controversy or removing an uncertainty." 47 C.F.R. § 1.2. Petitioners argue that the Commission was not presented with an actual controversy, since there was no request for equal time by any candidate against CBS or any other licensee. This is entirely too rigid an interpretation of the phrase "terminating a controversy or removing an uncertainty." The literal language and the fact that the rule contemplates action by the Commission sua sponte remove any doubt that the Commission's action in issuing the declaratory order was in accordance with its own procedural regulations
 
 
 [34]
 It is interesting, as Judge Wright notes, to compare the procedures followed by the FCC here with the more lengthy procedures approved in this court's en banc opinion in Ethyl Corp. v. EPA, 174 U.S.App.D.C. ---, --- F.2d ---- (No. 73-2205, decided March 19, 1976). See Dissenting Op. at ---- of --- U.S.App.D.C., at 389 of 538 F.2d n.99. The two cases differ substantially, however, in that the FCC's task here was to interpret a statute, while the EPA's task in Ethyl was to reach a conclusion based on scientific evidence. In the former case, the only relevant "public procedures" were hearings and debates already held by Congress; in the latter, extensive facts were to be studied by EPA and commented on by the public before a proper conclusion could be reached
 
 
 [1]
 47 U.S.C. § 315 (1970), as amended (Supp. IV 1974). Section 315 provides, in relevant part:
 (a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any
 (1) bona fide newscast,
 (2) bona fide news interview,
 (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
 (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),
 shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 (d) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.
 
 
 [2]
 See, e. g., Hearings on S. 2 Before the Subcommittee on Communications of the Senate Committee on Commerce, 94th Cong., 1st Sess., 53, 61-64 (1975); Federal Communications Commission, 39th Annual Report/Fiscal Year 1973 at 39. See also brief for petitioners the Honorable Shirley Chisholm and National Organization for Women (hereinafter Chisholm br.) at 61 & n.4
 
 
 [3]
 As this country moves toward public financing of political campaigns with overall limits on candidate expenditures, see Buckley v. Valeo, 424 U.S. 1, 82-108, 96 S.Ct. 612, 665-677, 46 L.Ed.2d 659, 724-739, 44 U.S.L. Week 4127, 4152-4159 (Jan. 30, 1976), the importance of the equal time requirement increases dramatically
 
 
 [4]
 Radio Act of 1927, ch. 169, § 18, 44 Stat. 1170
 
 
 [5]
 See note 11 infra
 
 
 [6]
 Lar Daly was a perennial minor candidate for mayor of Chicago. The Commission's decision held that he was entitled to equal time because of the broadcast, as parts of regularly scheduled news programs, of various film clips which pictured Mayor Richard Daley. One of the clips showed Mayor Daley greeting the President of Argentina at the Chicago airport
 
 
 [7]
 See also 105 Cong.Rec. 14440 (1959) (remarks of Sen. Pastore) ("We are not repealing section 315. We are merely writing into section 315 an exemption which will take care of the very ridiculous situation which is presented because of the Lar Daly decision."); id. at 14441-14442 (remarks of Sen. Pastore); id. at 14450-14451 (remarks of Sen. Engle); id. at 14456 (remarks of Sen. Pastore); id. at 16224 (remarks of Reps. Budge and Brown); id. at 16226-16227 (remarks of Rep. Celler); id. at 16236-16237 (remarks of Reps. Mack and Harris); note 23 infra
 The reports of both the Senate and the House committees also indicate the importance both bodies attached to the Lar Daly decision and the need for legislation to correct that decision. See S.Rep. No. 562, 86th Cong., 1st Sess., 4-7 (1959); id. at 15 (additional views of Sen. Hartke); H.R.Rep. No. 802, 86th Cong., 1st Sess., 2-4 (1959).
 
 
 [8]
 Overruling Lar Daly would technically have required only an exemption for candidate appearances on bona fide newscasts. See note 6 supra. The Commission's decision necessarily raised questions about other types of broadcasts which had traditionally been assumed to be unaffected by § 315. For example, if only regular newscasts were exempted a broadcaster would still be prevented by the Lar Daly decision from treating the arrival of the President of Argentina as an event warranting special coverage outside of the limits imposed by its normal scheduling. Similarly, regularly scheduled interview programs would remain covered by the decision's rationale even if its specific holding were overruled by Congress. Congress was aware of this problem:
 Mr. MACK. * * * I would like to ask the chairman of the committee if this is not the purpose of this legislation, to restore the original intent of the Congress and the original interpretation of this basic law.
 Mr. HARRIS. The gentleman is correct. That is the intention of the committee. Of course, it would necessarily have to clarify some of the things that arose as a result of that decision, and that, too, to be clarified by this legislation and the legislative history of it.
 
 
 [105]
 Cong.Rec. 16237. See also id. at 17781 (remarks of Rep. Harris). The exemption for "on-the-spot coverage of bona fide news events" was a product of this awareness and should be read, as it was intended, as part of the reversal of Lar Daly rather than as part of a broad reformulation of the equal time provision
 That is the crucial thing in this legislation to overrule the Lar Daly decision and to make it clear that important news events involving the appearance of a candidate may be covered on-the-spot without giving the right of equal time to other candidates.
 Id. at 16230 (remarks of Rep. Harris) (emphasis added); cf. note 21 infra.
 
 
 [9]
 See text accompanying notes 14-36 infra
 
 
 [10]
 As the congressional emphasis on the need for the Commission to utilize its expertise to fill in the details of the statutory scheme through rule making shows, see Parts I-B, II-A infra, the legislators did not attempt to predetermine all questions which would arise under the amendment. They did, however, focus on certain specific questions, such as the desirability of exempting debates from the equal time rule, and they had a clearly expressed central intent not to allow unequal use of the airwaves for political campaigning. See Part I-A-2 infra. Our role is to assure that the Commission remains faithful to that "clear statutory purpose." See L. Jaffe, Judicial Control of Administrative Action 569-575 (1965)
 
 
 [11]
 The Goodwill Station, Inc., 40 FCC 362, 24 P & F Radio Reg. 413 (1962) (debate); National Broadcasting Co. (Wyckoff ), 40 FCC 370, 24 P & F Radio Reg. 401 (1962) (debate); Columbia Broadcasting System, Inc., 40 FCC 395, 3 P & F Radio Reg.2d 623 (1964) (presidential and presidential candidate's press conferences). These decisions are all overruled by the decision under review
 
 
 [12]
 We must remember that we are not dealing with ordinary legislation: members of Congress are also candidates for political office. See text accompanying notes 84-86 infra. If they believed the Commission had misread their intent, no doubt they would have acted as promptly to reverse the Commission as they did after Lar Daly. The fact is that the Commission has repeatedly, but unsuccessfully, importuned the Congress to take such action. See notes 1-2 and accompanying text supra
 Congress is, of course, aware of the Commission's action reversing these long-standing prior decisions. See Broadcasting, March 8, 1976, at 23, 65. Consideration of corrective legislative action has been deferred pending the outcome of the present litigation. See reply brief for intervenors Office of Communications of United Church of Christ et al. (hereinafter UCC reply br.) at A-6 (transcript of Nov. 11, 1975 oversight hearing before Subcommittee on Communications of Senate Committee on Commerce). Thus there can be no inference that Congress approves the recent decision because it has not yet acted to overrule the Commission.
 
 
 [13]
 It is worthy of note that Commissioner Lee, the only current member of the Commission who was also on the Commission when the 1959 amendment was passed, dissented from the ruling under review on the ground that "the majority has sidestepped the very purpose of Section 315 of the Communications Act * * *." Aspen Institute Program on Communications, 55 FCC2d 697, 713, 35 P & F Radio Reg.2d 49, 68, JA 141, 164 (hereinafter Aspen )
 
 
 [14]
 Hearings on S. 1585 Before the Subcommittee on Communications of the Senate Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess., 2 (1959) (hereinafter Senate Hearings) (S. 1585, S. 1858). S. 1858, the "Fair Political Broadcasting Act of 1959," introduced by Sen. Hartke, would have completely revised § 315. S. 1585 simply added the listed exemptions to the existing law
 
 
 [15]
 Id. at 2, 4 (S. 1604, S. 1929). All of the bills before the committee contained some form of the broadcaster control requirement quoted in text
 
 
 [16]
 See, e. g., id. at 101-105 (Mr. Stanton of CBS)
 
 
 [17]
 See, e. g., id. at 261-262 (discussion between Sen. Thurmond and Sen. Keating); id. at 309 (statement of Dept. of Justice); id. at 315 (statement of American Civil Liberties Union). See also S.Rep. No. 562, supra note 7, at 15 (additional views of Sen. Hartke)
 
 
 [18]
 The Commission argues that testimony before a committee is of little value as a guide to legislative intent. Brief for respondents (hereinafter FCC br.) at 34. The Supreme Court, however, has relied on hearings as evidence of issues with which the committee was concerned, the same purpose for which I use the hearings. See American Ship Building Co. v. NLRB, 380 U.S. 300, 314-315, 85 S.Ct. 955, 965, 13 L.Ed.2d 855, 865 (1965). This concern supports giving greater weight to the committee's decision not to include an exemption for debates than would be warranted if the committee had not actively considered the question. Cf. Power Reactor Development Co. v. Int. Union of Electrical etc. Wkrs, 367 U.S. 396, 410-411, 81 S.Ct. 1529, 1536, 6 L.Ed.2d 924, 933 (1961) (citing as evidence that committee report's statement "must have been inadvertent" fact that witnesses had complained bill would not do what report said and committee had not changed language despite these complaints)
 
 
 [19]
 The fact that the bill reported by the committee included an exemption for "panel discussions," S.Rep. No. 562, supra note 7, completely refutes the Commission's argument, FCC br. at 21-22, that debates were not specifically exempted only because the committees were focusing on types of news coverage rather than on specific formats. See text accompanying notes 71-75 infra
 
 
 [20]
 See note 7 and accompanying text supra
 
 
 [21]
 Sen. Engle also noted that the exemption for news documentaries was not necessary to reverse Lar Daly, but he thought "there (was) some legitimate justification" for that exemption. 105 Cong.Rec. 14450
 22 * * * (P)anel discussions are something else again. News is a self-limiting factor. News must be current. It can be in the form of an interview or a news documentary. But it must be something of current interest; and thereby the very content of the broadcast limits the accessibility of the act and the abuse of it.
 What about panel discussions? One can get into a panel discussion on anything. My opponent used a panel discussion which he paid for, he thought it was so good. Anyone who holds public office can start a panel discussion on something or other; and merely by exposing himself to the public he gets an advantage which he should not have.
 I observe one other thing. Almost all the testimony was related to the matter of newscasts, not to other kinds of broadcasts.
 The Antitrust Division of the Department of Justice refused to go along with any extension into the field of panel discussions, public debates, and special news events.
 So that broadens the case. If there were merely public debates, there would not be any limitation whatsoever. So the opportunities for abuse in this particular section are those which concern me the most. * * *
 Id. (emphasis added).
 
 
 [23]
 Sen. Pastore, the bill's floor manager, emphasized that his main concern was overruling Lar Daly. Since the exemption for panel discussions went beyond what was necessary for that purpose, he did not attempt to defend it. See id. at 14443, 14452
 
 
 [24]
 Neither Sen. Javits nor Sen. Engle, see note 22 supra, distinguished between studio and nonstudio debates, and the bill reported by the committee did not require complete broadcaster control of all the arrangements as had the proposed bills. Thus the Commission's claim that the Senate's deletion of an exemption for debates affected only studio debates, see FCC br. at 22-23, is erroneous
 In view of the Committee's separate treatment of debates and panel discussions, it is not clear that the senators were correct to equate the two. The important point is that, after hearing an argument in favor of the panel discussion exemption phrased in terms of the value of debate between candidates, the Senate voted to eliminate the exemption. Interestingly, the first nonstudio debate among candidates broadcast nationally since the Commission's recent ruling more closely resembled a "panel discussion" than a "debate." See Shales, Forum Without Function, Washington Post, Feb. 25, 1976, § C at 1 col. 1.
 
 
 [25]
 Hearings on H.R.5389 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess., 4 (1959) (hereinafter House Hearings) (H.R. 7122). This bill was the equivalent of the Hartke bill. See note 14 supra
 
 
 [26]
 The Fair Political Broadcasting Act would, inter alia, have tied a presidential or vice-presidential candidate's eligibility for equal time to a required showing of support for the candidate or his party
 
 
 [27]
 House Hearings 3 (H.R. 5389)
 
 
 [28]
 Id. at 5
 
 
 [29]
 Intervenor National Broadcasting Co. (NBC) contends that Commissioner Ford's suggested exemption for special events "developed into" the language of § 315(a)(4). NBC br. at 18-20. This argument is rebutted by the fact that the two formulations were considered simultaneously by the House committee and treated as alternatives. The Ford suggestion was explicitly contrasted with the narrower proposals, such as H.R.7985, to exempt only news broadcasts. See House Hearings 99-102 (remarks of Reps. Moss and Harris)
 
 
 [30]
 E. g., House Hearings 128-129, 134-135, 138, 141, 146 (Mr. Stanton, CBS); id. at 171 (Mr. Fellows, National Association of Broadcasters); id. at 181-182 (Mr. McGannon, Westinghouse Broadcasting); id. at 184 (Mr. Butler, Democratic National Committee)
 
 
 [31]
 See id. at 123-156 (testimony of Mr. Stanton of CBS). Mr. Stanton did not distinguish between studio and nonstudio debates. See, e. g., id. at 134-135:
 Four years ago when we at CBS first urged modification of section 315, I pointed out that only about 75,000 people actually saw and heard the great Lincoln-Douglas debates. We felt, as we feel now, that television can provide on a nationwide basis, the modern counterpart of such great political debates, making it possible for every citizen to see and hear the candidates debating and addressing themselves to the critical issues of our time.
 The enactment of H.R. 7985, if it is amended to exempt debates, and of the fair political broadcasting bills, will make possible these programs to which I now firmly commit the CBS radio and television networks, and which, I submit, will make invaluable contributions to a quickened, informed, and intelligent democratic process.
 (Emphasis added.)
 
 
 [32]
 See, e. g., id. at 78-79 (remarks of Rep. Flynt); id. at 80-82, 142, 189 (remarks of Rep. Bennett); id. at 84 (remarks of Rep. Moss); note 89 infra
 
 
 [33]
 If anyone had believed that debates could be covered under Rep. Harris' exemption for "on-the-spot coverage of newsworthy events," the suggestion would surely have been made during the testimony which criticized H.R. 7985 for failing to include debates. See, e. g., id. at 146:
 Mr. FLYNT. Now we come to the question of particular on-the-spot newscasts. Do you feel that the law would be substantially clarified if an amendment were put in to exempt news reports, newscasts, and on-the-spot news coverage?
 Mr. STANTON. This would be an improvement, but I think you are short-changing yourself in not going the extra distance to include debates and discussion programs.
 The only examples of "newsworthy events" discussed during the hearings were political conventions, id. at 2, 88, 102, 156, and opening of the Russian exhibit at the New York Coliseum, id. at 89.
 In view of the deliberate decision of the bill's drafter not to include debates, this unquestioning acceptance of the conclusion that debates were not covered by H.R. 7985 deserves great weight. See Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232, 243-250, 96 S.Ct. 508, 516-518, 46 L.Ed.2d 464, 474-477 (1976); cf. note 18 supra.
 
 
 [34]
 The committee did make some changes in the Harris bill, mostly in an effort to reduce its impact on the equal time principle. Thus the committee deleted the exemptions for news documentaries and panel discussions because "it was felt that these terms are difficult to define, and without proper definition they might permit an unnecessarily broad exemption from the equal-time requirement." H.R.Rep. No. 802, supra note 7, at 12. Similarly, the committee omitted the "broad and indefinite category" covered by the phrase "or similar type program" and substituted the words "news events" for "newsworthy events." The latter change was made because
 (i)t was felt that the language of the introduced bill in this regard (newsworthy events) was unnecessarily vague and might result in a greater weakening of the equal-time requirement than would be desirable.
 Id. at 13. In addition to these changes designed to tighten the bill, the committee also replaced the "limiting requirement" that the broadcaster or network determine the broadcast's format, production, and participants with the "more appropriate" requirement that the candidate appearance be "incidental to the presentation of news." Id.
 
 
 [35]
 See also H.R.Rep. No. 802, supra note 7, at 12-13
 There is no suggestion in the legislative history that anyone in the House believed, as did Sens. Engle and Javits, see note 24 and accompanying text supra, that panel discussions and debates were interchangeable descriptions of the same type of occurrence. But even if this confusion had existed in the House, so that Rep. Harris' statement could be read as referring to debates, the statement would not support the Commission's conclusion that candidates' debates are "bona fide news events" if they occur outside a studio and a broadcaster chooses in good faith to put them on the air. Rep. Harris and the committee excluded debates and the other program categories from the bill because they were concerned to avoid broad, vague exemptions. See --- U.S.App.D.C. at ----, 538 F.2d at pp. 355-356, & note 34 supra. It belittles this concern to conclude that the deleted program categories can be made into exempt "news events" simply by the existence of a nonbroadcaster sponsoring organization.
 (T)here can be no valid distinction, under Section 315, between two broadcast programs, both involving the appearance of opposing political candidates and otherwise identical in all material respects, simply on the basis that one program was staged by a broadcaster under conditions satisfactory to the candidates, and the other program was staged by a third party and covered by the broadcaster upon invitation, also under conditions satisfactory to the candidates.
 Wyckoff, supra note 11, 40 FCC at 372, 24 P & F Radio Reg. at 403 (footnote omitted).
 
 
 [36]
 See, e. g., 105 Cong.Rec. 16228-16230 (remarks of Rep. Harris)
 
 
 [37]
 E. g., FCC br. at 35, 38-42; CBS br. at 31-36; majority op. at ---- of --- U.S.App.D.C., at 361 of 538 F.2d; Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), and Power Reactor Development Co. v. Int. Union of Electrical etc. Wkrs, supra note 18, are the two most frequently cited cases
 
 
 [38]
 See, e. g., Chisholm br. at 65; brief for petitioner Democratic National Committee (hereinafter DNC br.) at 48-52. Petitioners place their greatest reliance on NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); Farmers Educational & Cooperative Union v. WDAY, Inc., 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959); and Kay v. FCC, 143 U.S.App.D.C. 223, 443 F.2d 638 (1970)
 
 
 [39]
 The Supreme Court has suggested that subsequent congressional action or inaction leaving untouched an administrative action deserves the greatest weight when there is a congressional committee charged with and engaged in the duty of exercising continuous and detailed oversight. See Zuber v. Allen, supra note 37, 396 U.S. at 185-186 n.21, 90 S.Ct. at 323-324, 24 L.Ed.2d at 355-356; Power Reactor Development Co. v. Int. Union of Electrical etc. Wkrs, supra note 18, 367 U.S. at 408, 81 S.Ct. at 932, 6 L.Ed.2d at 932. Congressional changes in other aspects of the relevant statutory provision, when combined with congressional awareness of the administrative action, also add weight to the implication that Congress did not reverse the disputed action because it agreed with that action. See NLRB v. Bell Aerospace Co., supra note 38, 416 U.S. at 288, 94 S.Ct. 1757, 40 L.Ed.2d 134; Farmers Educational & Cooperative Union v. WDAY, Inc., supra note 38, 360 U.S. at 533 & n.15, 79 S.Ct. at 1307, 3 L.Ed.2d at 1413
 
 
 [40]
 Administration of the equal time requirement is, naturally, an area of great concern to the elected politicians in Congress. See text accompanying notes 85-86 infra. Accordingly, congressional committees maintain careful vigilance over the Commission's actions regarding § 315, see notes 12 supra, 48 infra, and the Commission is required to call its important equal time decisions to Congress' attention. See p. ---- of --- U.S.App.D.C., p. 391 of 538 F.2d infra. The majority denigrates this congressional concern as "technical" awareness of the Commission's actions, majority op. at ---- of --- U.S.App.D.C., 362 of 538 F.2d; but the Supreme Court has recognized that Congress' interest in § 315 is significant. See Farmers Educational & Cooperative Union v. WDAY, Inc., supra note 38, 360 U.S. at 533 & n.15, 79 S.Ct. at 1307, 3 L.Ed.2d at 1413
 
 
 [41]
 The 1960 suspension is important because the congressional understanding of the need for and impact of that suspension indicates what the Congress that passed the 1959 amendment believed not to be covered by that amendment. It is also important because the Commission relied on the 1960 suspension when it ruled in 1962 that debates could not be considered "bona fide news events." See The Goodwill Station, Inc., supra note 11, 40 FCC at 363-364; Wyckoff, supra note 11, 40 FCC at 372
 
 
 [42]
 Chisholm br. at 40-44
 
 
 [43]
 See 106 Cong.Rec. 14473 (1960); S.Rep.No.1539, 86th Cong., 2d Sess., 2 (1960)
 
 
 [44]
 S.Rep. No. 1539, supra note 43, uses the same language as Sen. Pastore, who apparently based his statement to the Senate on the committee report. The relevant portion of the report states:
 Last year's amendments to the Communications Act were the first major modifications of the equal opportunity provisions since the adoption of the Radio Act in 1927. Not enough time has elapsed for a full evaluation of this amendment. However, this liberalization should lead to a fuller and more meaningful news coverage of the actions and appearances of legally qualified candidates. Your committee recognizes that the changes of the last session have not been perfect. It was a cautious move into an uncharted area but sound, commonsense administration on the part of the Federal Communications Commission is essential to avoid the obstacles that may lead to abuse.
 Id. at 2.
 
 
 [45]
 See note 44 supra
 
 
 [46]
 See note 41 supra
 
 
 [47]
 The Commission's inability adequately to explain why it has rejected the view of the 1960 congressional action it found convincing a mere two years after the event, see note 41 supra, is indicative of the Commission's failure to provide a sufficient explanation for reversing its prior holdings. See Part II-B infra
 
 
 [48]
 Since 1960 Senate and House committees have held a total of at least 12 hearings dealing with political broadcasting and § 315. See Chisholm br. at 44-60. In 1971, see Pub.L. No. 92-225, §§ 103(a)(1), (2)(B), 104(c), 86 Stat. 4, 7, and again in 1974, see Pub.L. No. 93-443, § 402, 88 Stat. 1291, Congress amended § 315 without disturbing the Commission's rulings. While these legislative actions may not be technical reenactments, see FCC br. at 39-42, they provide some support for the proposition that Congress agreed with the Commission's position. See NLRB v. Bell Aerospace Co., supra note 38, 416 U.S. at 275, 288, 94 S.Ct. 1762, 1768, 40 L.Ed.2d 143, 150 (noting that Congress "let stand" NLRB's definition of "managerial employees" when it passed the Labor-Management Reporting and Disclosure Act, 73 Stat. 519 (1959), which neither reenacted the National Labor Relations Act nor amended the latter Act's definitional provisions)
 
 
 [49]
 Press conferences were not explicitly considered in the discussion of the 1960 suspension of the equal time provision for the presidential campaign. Following the Commission's decision in Columbia Broadcasting System, Inc., supra note 11, of which Congress was officially informed in the Commission's annual report, Federal Communications Commission, 31st Annual Report for the Fiscal Year 1965 at 86, the subsequent history of congressional acquiescence is the same as for the debate decisions. See note 48 supra
 
 
 [50]
 The Commission has long recognized an exception to § 315 for speeches to their constituents by elected leaders, who happen to be candidates for reelection, concerning current events of critical importance. Republican National Committee, 40 FCC 408, affirmed by equally divided court, sub nom. Goldwater v. FCC, No. 18,963 (D.C.Cir. Oct. 27, 1964), cert. denied, 379 U.S. 893, 85 S.Ct. 169, 13 L.Ed.2d 97 (1964) (presidential address concerning Chinese nuclear explosion and Soviet leadership change); Public Notice 38387, 40 FCC 276 (1956) (presidential address concerning Suez crisis). An analogous exemption for press conferences triggered by and limited to a specific important event might also be appropriate. By its nature such an exemption could be invoked only infrequently, and it could not be used for generalized campaigning. Cf. note 22 supra (remarks of Sen. Engle)
 CBS attempts to support the Commission's ruling by noting the reasons for an exemption for a press conference keyed to an extraordinary event. CBS br. at 10-12. The Commission has not, however, so limited its ruling. Moreover, the Commission's requirement that broadcasts be live in order to qualify under § 315(a)(4) has the curious result of requiring the broadcaster to decide in advance whether to air a press conference (or debate) without knowing what will occur. Thus the Commission requires the broadcaster to act on the basis of the newsworthiness of the candidate, not of the event about which the candidate will speak. The CBS argument fails to recognize these differences between the narrow exemption that might be justified and the sweeping exemption the Commission has created. As the Commission itself noted in 1964, "Exemption of such extraordinary reports does no violence to the thrust or scheme of Section 315 * * * ." Republican National Committee, supra, 40 FCC at 410 (emphasis added). See also note 63 infra.
 
 
 [51]
 In Bell Aerospace the Court noted the existence of a category of persons "so clearly outside the (National Labor Relations) Act that no specific exclusionary provision was thought necessary." 416 U.S. at 283, 94 S.Ct. at 1766, 40 L.Ed.2d at 134. The category with which the Court was concerned was not even specifically mentioned in the legislative history
 
 
 [52]
 See Senate Hearings 261 (remarks of Sen. Keating) (panel discussions, debates, or similar programs "are informational, platform-type shows where indirect appeals for votes are made. As such, all substantial candidates deserve an opportunity to be heard.")
 
 
 [53]
 CBS suggests that the core concern of § 315 is with sold or donated time, and that the Commission's decision should therefore not be viewed as substantially weakening the equal time principle. CBS br. at 29. The only support CBS cites for this contention is the statement in the Senate Report that
 (t)he equal time provision of section 315(a) was designed to assure a legally qualified candidate that he will not be able to acquire unfair advantage over an opponent through favoritism of a station in selling or donating time or in scheduling political broadcast. * * *
 S.Rep. No. 562, supra note 7, at 8-9, U.S.Code Cong. & Admin.News 1959, p. 2571 (emphasis added). However, as the emphasized phrase indicates, even this sentence suggests that Congress was concerned with more than sold or donated time. Moreover, as the legislative history discussed in text and note 54 infra demonstrates, "traditional campaign efforts to persuade the electorate to vote one way or another * * * (are) the first and foremost concern" of § 315. Brief for intervenor American Broadcasting Companies (hereinafter ABC br.) at 21.
 
 
 [54]
 See, e. g., H.R.Rep. No. 802, supra note 7, at 6 ("as a matter of principle, it is not the intention of the committee that staged incidents or stump speeches be considered 'news' within the context of this legislation." ); 105 Cong.Rec. 16232 (remarks of Mrs. May); id. at 16236 (remarks of Rep. Macdonald) ("staged events such as a candidate pictured visiting a long established factory or oil refinery * * * and * * * shaking hands with workers should not be viewed as news but as a staged event"); Senate Hearings 219 (remarks of Sen. Pastore) ( "For instance, if it was an outright political speech or political appearance the candidate made, then I think you would want to protect the candidates."); id. at 261 (remarks of Sen. Keating); House Hearings 128 (testimony of Mr. Stanton of CBS) ("The campaign speeches are unaffected by these provisions, so far as they are concerned, such appearances remain subject to the full sweep of the equal time requirements."); id. at 135, 138 (same)
 
 
 [55]
 See, e. g., Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 188-189, 454 F.2d 1018, 1031-1032 (1971); Washington Post, March 5, 1976, § A at 1 col. 4; Washington Star, Feb. 18, 1976, § A at 1 col. 3
 
 
 [56]
 Although the quoted statement is taken from the portion of the House report dealing with news broadcasts, the report stated that the same considerations apply "with even greater force to on-the-spot coverage of news events." H.R.Rep. No. 802, supra note 7, at 6. The quoted paragraph follows the report's statement that the requirement that candidate appearances be "incidental to the presentation of news" encompasses several factors, but the statement of principle does not itself appear to be an aspect of the "incidental to" test. Nothing in the legislative history of the deletion of the "incidental to" test suggests that that action was meant to negate the exclusion of "staged incidents or stump speeches" from the scope of the 1959 amendment. See text accompanying notes 87-89 infra ; note 61 infra
 
 
 [57]
 See, e. g., 105 Cong.Rec. 16225 (remarks of Rep. Brown); notes 14-15, 28 supra and accompanying text. As the Senate Report explained:
 It should be noted that the programs that are being exempted in this legislation have one thing in common. They are generally news and information-type programs designed to disseminate information to the public and in almost every instance the format and production of the program is under the control of the broadcast station, or the network in the case of a network program.
 S.Rep. No. 562, supra note 7, at 11, U.S.Code Cong. & Admin.News 1959, p. 2573 (emphasis added). It is curious that the Commission's insistence on limiting its holding to nonstudio debates somehow reverses the congressional presumption. See also notes 24, 31 supra, 68, 107 infra.
 
 
 [58]
 The conference report stated:
 In the conference substitute, in referring to on-the-spot coverage of news events, the expression "bona fide news events" instead of "news events" is used to emphasize the intention to limit the exemptions from the equal time requirement to cases where the appearance of a candidate is not designed to serve the political advantage of that candidate.
 H.R.Rep. No. 1069, 86th Cong., 1st Sess., 4 (1959). See also note 59 infra.
 
 
 [59]
 The Commission concludes from this observation that Congress must have been focusing on the intent of the broadcaster rather than on the intent of the candidate. See Aspen, 55 FCC 2d at 705 n.10, 35 P & F Radio Reg.2d at 59 n.10, JA 152 n.10; FCC br. at 25-26. The following colloquy between Sens. Proxmire and Pastore shows that the Commission's conclusion is plainly erroneous:
 Mr. PROXMIRE. I should like to ask the Senator, in connection with the bill, if it is not true that what the bill does is to make an exception to section 315(a) in the case of an appearance by a candidate on a newscast.
 Mr. PASTORE. That is correct, provided he did not initiate the newscast, provided he did nothing affirmatively to advance his own candidacy in other words, if his appearance was a part of the information being given to the public as a newscast.
 Mr. PROXMIRE. Is that language in the bill, or is that the interpretation of the Senator from Rhode Island?
 Mr. PASTORE: That is the interpretation of the junior Senator from Rhode Island in making the legislative history on this amendment.
 
 
 [105]
 Cong.Rec. 14446 (emphasis added)
 
 
 [60]
 The example of the impeachment inquiry should assuage the Commission's fear that if it looked beyond the broadcaster's intent "no political event could be covered except the most innocuous ribbon-cutting ceremony." 55 FCC 2d at 705 n.10, 35 P & F Radio Reg.2d at 59 n.10, JA 152 n.10. It is interesting to note that the Public Broadcasting System broadcast the impeachment inquiry on a delayed basis to allow daytime workers to watch the proceedings. See notes 68, 107 infra
 
 
 [61]
 See Chisholm reply br. at 6 ("the critical distinction is between an appearance of a candidate in a bona fide news event and appearance of a candidate as the news event itself." (emphasis in original)). This analysis is not the same as a test which turns on whether the candidate's appearance is "incidental to" or central to the event, but it admittedly has some echoes of such a criterion. This is not disturbing since, as Rep. Harris told the House, the "incidental to" language added to the bill by the full committee was "merely interpretive" of the bill's provisions. 105 Cong.Rec. 16230. When that test was eliminated from the bill because Congress feared that its legislative formulation would prove unworkable, no change was wrought in the underlying purpose of either the 1959 amendment or the basic equal time provision. See notes 87-89 infra and accompanying text. See also 105 Cong.Rec. 17781 (remarks of Rep. Harris) (only "major difference" between bill reported by conference committee and House bill is inclusion of exemption for regularly scheduled interview programs)
 
 
 [62]
 Congress recognized that this would often be the case with news events given "on-the-spot coverage," see H.R.Rep. No. 802, supra note 7, at 7. Congress nevertheless believed that the degree of candidate or broadcaster control could be a useful indicator of whether an occurrence is a "news event" or a "staged political event." The majority's conclusion that "a candidate's partial control over a press conference or debate does not, by itself, exclude coverage of the event from Section 315(a)(4)," majority op. at ---- of --- U.S.App.D.C., at 359 of 538 F.2d (emphasis added), is not inconsistent with this legislative history. However, the majority fails to explain its justification for completely ignoring this factor
 The Commission, FCC br. at 24, and intervenors, e. g., NBC br. at 17-18 n.5, argue that if excerpts of an event can be broadcast on a regular news program without triggering the equal time provision, on-the-spot coverage can also be provided without creating an equal time obligation. The congressional recognition that news events covered on the spot are especially susceptible of abuse, see H.R.Rep. No. 802, supra, at 7, indicates the error in that argument. The statute itself refutes the contention that if excerpts may be broadcast under § 315(a)(1) the entire event may be broadcast under § 315(a) (4). Section 315(a)(1) requires only that the newscast be bona fide; it says nothing about the events covered on that newscast. Section 315(a)(4), of course, requires that the news event be bona fide. See also Columbia Broadcasting System, Inc., supra note 11, 40 FCC at 396, 3 P & F Radio Reg.2d at 625; Wyckoff, supra note 11, 40 FCC at 371, 24 P & F Radio Reg. at 402.
 
 
 [63]
 An acceptance speech, which is clearly within § 315(a)(4), is completely within the control of the candidate. This fact does not invalidate the preceding analysis. An acceptance speech is a unique occurrence which culminates a political convention. An exemption motivated primarily by a desire to assure that the Lar Daly decision did not prevent broadcast of such conventions, see note 33 supra, would be incomplete if acceptance speeches were not included. Moreover, unlike press conferences which can be called at the candidate's pleasure, an acceptance speech can occur only once during a campaign. Cf. note 22 supra (remarks of Sen. Engle); note 50 supra. Congressional recognition of these distinctions among types of events should not be treated as a license to treat all events as if they were alike
 
 
 [64]
 See note 34 supra
 
 
 [65]
 See majority op. at ---- of --- U.S.App.D.C., 358 of 538 F.2d ("the inherent newsworthiness of speeches and debates" (emphasis added)). The majority compares speeches and debates to "political conventions and activities incidental thereto" and concludes that since the latter are exempt the former must also be exempt. Id. This argument is fallacious. See note 63 supra
 
 
 [66]
 See, e. g. Washington Post, Feb. 16, 1976, § A at 1 col. 1
 
 
 [67]
 The same observations would be true, although to a lesser degree, of candidates for lesser and local offices
 
 
 [68]
 See text accompanying notes 6-9, 14-36 supra. Recognition that the Commission's decision is inconsistent with the purpose of Congress may account for the strained and unconvincing efforts to demonstrate that the Commission's ruling is narrowly limited to nonstudio debates and press conferences broadcast live and in their entirety. 55 FCC 2d at 707, 35 P & F Radio Reg.2d at 62, JA 156. Although the majority apparently recognizes the true breadth of the Commission's decision, see note 65 supra, it generally ignores this insight. See majority op. at ---- of --- U.S.App.D.C., at 361 of 538 F.2d. The intervenors on behalf of the Commission are not so hesitant; taken together, they attack all of the purported limitations on the Commission's decision as unsupported by the statute, the legislative history, or the Commission's reasoning. See br. for intervenor Radio Television News Directors Association (RTNDA) at 15 n.32 (requirement that coverage be live and in entirety "not supported by legislative history, journalistic ethic, or logic."); NBC br. at 28 n.12 (delayed broadcast would be exempt); CBS br. at 9 (broadcast of any candidate debates exempt); ABC br. at 20 & n.21 (questioning requirement that press conference be broadcast live and in entirety; noting that speech would be exempt in same circumstances as debate). See notes 24, 31, 50, 57, 60, supra, 107 infra
 As I have shown, the legislative history conclusively bars the Commission from adopting the specific holdings now before us. Appreciation of the actual scope of the Commission's decision fortifies my conviction that the Commission has unlawfully assumed power to rewrite its governing statute.
 
 
 [69]
 See materials cited in note 55 supra
 
 
 [70]
 Application of these criteria to debates shows that they too are campaign events, not news events
 
 
 [71]
 I agree with the Commission's holding, not challenged here, that press conferences are not exempt as "bona fide news interviews" under § 315(a)(2)
 
 
 [72]
 FCC br. at 21. The brief follows this statement with a quotation from the legislative history:
 "The pending bill refers only the type of political reporting that radio and television stations indulge in without having to provide equal time." Remarks of Rep. Celler, 105 Cong.Rec. 19226, Aug. 18, 1959 (emphasis added).
 Id. In context Rep. Celler's statement is as follows:
 The remarks of the gentleman from Missouri were addressed to the question of prime hours on radio and television with relation to chains. That matter is quite alien to the subject matter of the instant bill.
 The pending bill refers only to the type of political reporting that radio and television stations indulge in without having to provide equal time. It is quite different than the subject of prime hours.
 
 
 [105]
 Cong.Rec. 16226 (1959)
 
 
 [73]
 See note 19 supra
 
 
 [74]
 See Parts I-A-1, I-A-2 supra
 
 
 [75]
 See, e. g., 105 Cong.Rec. 16228-16230 (remarks of Rep. Harris); Parts I-B, II-B-1 infra
 
 
 [76]
 Nothing in the conference report warrants the Commission's reliance on that document as support for its standard of deference to broadcaster judgment in determining what types of events fall within § 315(a)(4). The only reference to "news judgment" in the conference report occurs in the following paragraph dealing with news interviews (§ 315(a)(2)):
 It is intended that in order for a news interview to be considered "bona fide" the content and format thereof, and the participants, must be determined by the licensee in the case of a news interview originating with the licensee of a station and by the network in the case of a news interview originating with a network; and the determination must have been made by the station or network, as the case may be, in the exercise of its "bona fide" news judgment and not for the political advantage of the candidate for public office.
 H.R.Rep. No. 1069, supra note 58, at 4. This statement was part of a restrictive test established by the committee for determining whether a program comes within the exemption created by § 315(a)(2). The Commission recognized the restrictiveness of that test in the present proceeding when it held that press conferences are not "bona fide news interviews." See 55 FCC 2d at 708-710, 35 P & F Radio Reg.2d at 63-65, JA 157-159. The conference committee also emphasized its intention to limit the exemption created by § 315(a)(4):
 In the conference substitute, in referring to on-the-spot coverage of news events, the expression "bona fide news events" instead of "news events" is used to emphasize the intention to limit the exemptions from the equal time requirement to cases where the appearance of a candidate is not designed to serve the political advantage of that candidate.
 H.R.Rep. No. 1069, supra, at 4.
 
 
 [77]
 Accord, 55 FCC 2d at 708, 35 P & F Radio Reg.2d at 63, JA 157
 
 
 [78]
 A candidate will apparently have to provide extrinsic evidence of broadcaster bad faith in order to prevail on an equal time claim under the Commission's new approach. See Kay v. FCC, supra note 38, 143 U.S.App.D.C. at 227 n.9, 443 F.2d at 642 n.9; NBC br. at 34; brief for amici Aspen Institute Program for Communications & Society and Common Cause (Aspen br.) at 17 n.29. Amici suggest that testimony of a station employee would suffice. Aspen br. at 17 n.29. They do not suggest how a victimized candidate can be expected to uncover such testimony and present it to the Commission in time for the Commission (and the courts) to act before the election is over
 Amici also contend that the fairness doctrine now provides significant backup relief. Id. at 22-26; see 55 FCC 2d at 708 & n.18, 35 P & F Radio Reg.2d at 62 & n.18, JA 156 & n.18. This argument has two glaring weaknesses. First, since the Commission's new equal time standard incorporates the fairness doctrine's approach of deference to the broadcaster, see note 81 infra, it is difficult to understand how that doctrine can assist a candidate whose equal time remedy has been eliminated by adoption of the deferential standard. Second, even amici acknowledge that the fairness doctrine is potentially helpful only to the candidates of the major parties. See Aspen br. at 22-26.
 
 
 [79]
 The broadcaster's freedom is subject to the limited restraints created by the possibilities that an opposing candidate will be able to uncover extrinsic evidence that the broadcaster was serving partisan interests or that the fairness doctrine will be invoked. See note 78 supra
 
 
 [80]
 See notes 24, 31, 57, 60, 68 supra, 107 infra
 
 
 [81]
 This specific congressional rejection of a standard of reliance on broadcaster discretion differentiates this equal time case from cases under the fairness doctrine in which such a standard has been held appropriate. See, e. g., Straus Communications, Inc. v. FCC, 174 U.S.App.D.C. 149, 530 F.2d 100 (1976). In Straus we noted that "the Commission has evolved a unique and narrow standard to guide its review when a licensee is charged with violating the Fairness Doctrine or its subsidiary rules * * *." 174 U.S.App.D.C. at 156, 530 F.2d at 1008. We have frequently warned that this "unique and narrow standard" of the fairness doctrine must be differentiated from the operation of the equal time rule. See e. g., Democratic National Committee v. FCC, 148 U.S.App.D.C. 383, 396-397, 460 F.2d 891, 904-905 (Tamm, J.), cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); Green v. FCC, 144 U.S.App.D.C. 353, 358, 447 F.2d 323, 328 (1971) (Wilkey, J.). See also Memorandum Opinion and Order, 25 FCC 2d 283, 291-292 (1970); Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 FCC 598, 599 (1964) ("There is thus room for considerably more discretion on the part of the licensee under the fairness doctrine than under the 'equal opportunities' requirement.")
 
 
 [82]
 See note 75 supra ; p. ---- of --- U.S.App.D.C., pp. 385-386 of 538 F.2d infra
 
 
 [83]
 Rejection of broadcaster discretion as the central criterion of the exemptions was explicitly confirmed on the floor of the Senate by Sen. Pastore:
 Mr. MORTON. * * * Are we not in the bill really relying on the responsibility, fair-mindedness, and integrity of the broadcasting industry? If they do not meet the challenge, we will have to face up to it.
 Mr. PASTORE. We do not meet them in that fashion. We subject ourselves to their judgment, insofar as procedures are concerned. But basically we have left in the law the philosophy of Congress that equal time shall be given to opposing candidates.
 
 
 [105]
 Cong.Rec. 14442 (emphasis added)
 
 
 [84]
 See, e. g., 105 Cong.Rec. 14439-14440, 14446, 17829 (remarks of Sen. Pastore); id. at 17832 (remarks of Sen. Scott)
 
 
 [85]
 See 67 Cong.Rec. 12501-12505 (1926); 68 Cong.Rec. 3034-3035 (1927)
 
 
 [86]
 See, e. g., note 22 supra (remarks of Sen. Engle)
 
 
 [87]
 The question Congress wished to be able to answer was whether the amendment proved to be an "effective and practicable" means of restoring the pre-Lar Daly balance between the rights of candidates and the needs of broadcasters. See H.R.Rep. 802, supra note 7, at 4-5; notes 6-9 supra and accompanying text. The majority's statement of the purpose of the legislation, majority op. at ----, ---- - ---- of --- U.S.App.D.C., at 356, 357-358 of 538 F.2d, ignores half of the balance Congress was trying to reestablish
 
 
 [88]
 See notes 82-83 supra and accompanying text
 
 
 [89]
 Mr. BENNETT. Now, dealing with the other part, the newscast part, if I read correctly, the language which you suggest * * * in effect would give the station or network almost complete and unlimited control over this type of broadcast on the part of political candidates. To me the language "newscasts, news interviews, news documentaries, panel discussions, debate, and special events programs," is so broad that I do not know what other category you could pick out that a candidate could possibly participate in which would not come under one of these terms you have in that section. Do you?
 The broadcaster would be free to do as he pleases except that he would have to make an objective presentation of whatever he did present, whatever that means.
 I do not believe that what you suggest here is the right way to deal with it. I do not think unlimited arbitrary control of what is or is not to be shown under the guise of a newscaster's debate ought to be left in the hand of the television or radio industry. I think you would be creating more problems than you would be solving.
 * * * If I were spokesman for your industry I would probably feel as you do. Certainly, what you have said is true, namely, that this would give complete authority to the industry to determine what will go on and no one will have any remedy. When you speak of only a few isolated cases or abuses of it, that could be true, but if it is possible to do it, and it would be under this kind of language, the substitution might be very real and very damaging to the particular individual concerned.
 For my part, I would rather see nothing in the act than this complete and specific unlimited authority which would be given to the industry.
 House Hearings 80-82 (emphasis added). See also note 61 supra.
 
 
 [90]
 The Senate report's statement that "(t)he proposal affords the licensee freedom to exercise his judgment in the handling of this type program * * * ," S.Rep. No. 562, supra note 7, at 14, U.S.Code Cong. & Admin. News 1959, p. 2576 (emphasis added), quoted, CBS br. at 17, is consistent with this analysis. Discretion "in the handling of this type program" is a far cry from granting the broadcaster virtually unreviewable discretion to determine whether a program is of the required "type." See also note 83 supra (remarks of Sen. Pastore) (broadcaster judgment governs procedures only); text accompanying notes 103-104 infra. Rep. Harris' statement, heavily relied on by the Commission and its proponents, see, e. g., 55 FCC2d at 704 n.9, 35 P & F Radio Reg.2d at 57-58 n.9, JA 151 n.9; majority op. at ---- of --- U.S.App.D.C., at 359-360 of 538 F.2d; FCC br. at 26 n.13; NBC br. at 16, 34, that the bill leaves "reasonable latitude" for exercise of good faith broadcaster judgment, 105 Cong.Rec. 17782, similarly suggests a confined role for broadcaster discretion
 In Thomas R. Fadell, 40 FCC 380, 25 P & F Radio Reg. 288, aff'd mem., 25 P & F Radio Reg. 2063 (7th Cir. 1963), the only equal time case cited by the majority in support of the Commission's new approach, majority op. at ---- of --- U.S.App.D.C., at 359 of 538 F.2d, the Commission utilized the two-step analysis described in text. There the Commission first reached its own determination that the program broadcast involved a "news event" within the meaning of § 315(a)(4). It then went on to consider whether there was any indication that the broadcaster's decision to broadcast or its treatment of the program was affected by partisan motives. Finding no such evidence, the Commission concluded "that in the circumstances of this case, the program falls within the 'reasonable latitude for the exercise of good faith news judgment on the part of the (licensee)' * * * and is exempt from the equal time requirement of Section 315." 40 FCC at 382. The Commission now maintains that the conclusion in Fadell should be the starting point for analysis under § 315(a)(4) and that absence of any evidence of the broadcaster's intent to advance a candidate's cause eliminates the need for any further inquiry.
 
 
 [91]
 See text accompanying notes 82-84 supra
 
 
 [92]
 See note 11 supra
 
 
 [93]
 See Petition for Revision of First Report/Fairness Report in Docket No. 19260 or for Issuance of Policy Statement or Declaratory Ruling, JA 1-21
 
 
 [94]
 See note 11 supra
 
 
 [95]
 See CBS Petition for Declaratory Ruling, JA 22-44. CBS also sought to have the Commission rule that a press conference is a "bona fide news interview" under § 315(a)(2). See notes 71, 76 supra
 
 
 [96]
 The Commission states that filing of the Aspen petition was announced in a press release, referred to the same day by the Commission's chairman in a prepared statement for the Senate communications subcommittee, and noted in Broadcasting magazine. FCC br. at 7 n.1. Petitioner Democratic National Committee learned of the filing of the CBS petition from reports in the press. DNC br. at 11
 
 
 [97]
 See JA 45, 70, 127
 
 
 [98]
 See JA 121 (Congressional Black Caucus), 123 (Citizens for Reagan for President), 125 (Hon. Jimmy Carter), 126 (League of Women Voters)
 
 
 [99]
 It is interesting to compare the procedures followed by the FCC here with the lengthy public procedures approved in this court's en banc opinion in Ethyl Corp. v. EPA, --- U.S.App.D.C. ----, --- F.2d ---- (No. 73-2205, decided March 19, 1976). The four dissenting judges in Ethyl would require the agency to follow even more stringent procedures. See Wilkey dissent at ---- - ---- of --- U.S.App.D.C., ---- - ---- of --- F.2d
 
 
 [100]
 As recently as 1970 the Commission stated:
 * * * The grant of authority to agencies to issue declaratory orders is limited, and such orders are authorized only with respect to matters which are required by statute to be determined "on the record after opportunity for an agency hearing." * * * In general, the Commission limits its interpretive rulings or advisory opinions to situations where the critical facts are explicity (sic) stated without the possibility that subsequent events will alter them. It prefers to issue such rulings or opinions where the specific facts of a particular case in controversy are before it for decision. In response to general inquiries, the Commission limits itself to giving general guidelines to help an individual or station determine their rights and obligations under section 315. * * *
 Use of Broadcast Facilities by Candidates for Public Office (Public Notice of August 7, 1970), 35 Fed.Reg. 13048, 13067 (1970). Here the Commission had no "particular case in controversy * * * before it for decision," and it had no "specific facts" on which to base its ruling. See note 107 infra.
 
 
 [101]
 The majority recognizes the limited nature of the Bell Aerospace holding, see majority op. at ---- of --- U.S.App.D.C., at 364 of 538 F.2d, but it fails to compare the narrowness of that holding with the breadth of the Commission's decision in this case
 
 
 [102]
 Even if the Commission's decision is viewed as limited to nonstudio debates and press conferences broadcast live and in their entirety, but see notes 24, 31, 50, 57, 60, 68 supra, 107 infra, exempting all such programs is a significantly broader ruling than is a decision that buyers employed by a particular firm are or are not managerial employees
 
 
 [103]
 Following issuance of rules defining exempt types of programs, the Commission could decide controversies relating to particular broadcasts by interpreting and applying its rules. See S.Rep. No. 562, supra note 7, at 13
 
 
 [104]
 The Commission's discretion is, of course, limited by the guidelines established in the legislative history. See Parts I-A, I-B supra
 
 
 [105]
 If the Commission were just correcting a legal error in its prior interpretations of the legislative history, as it claims to be doing, there would be no need for it to gather information on which to base an expert decision. In fact, however, the Commission has made a basic policy decision which, on the view most favorable to its position, is not at all compelled by the legislative history. See note 106 & Part II-B infra. See also ABC br. at 9-12, 18
 
 
 [106]
 The majority's heavy reliance on the discretion granted the Commission, see majority op. at ----, ---- - ----, ----, ---- - ----, ---- of --- U.S.App.D.C., at 351, 356-358, 360, 363-364, 366 of 538 F.2d, indicates its awareness that the Commission's decision is not simply the product of a correct application of the rules of statutory construction
 
 
 [107]
 Presumably the "critical facts" to which the Commission refers are mirrored in the requirements that debates be nonstudio debates, i. e., that they not be sponsored by the broadcaster, and that coverage of both debates and press conferences be live and in full. However, the overruled decisions do not appear to have involved these "critical facts." In 1963, a mere eight months after issuing its ruling in the Wyckoff case, see note 11 supra, the Commission informed Congress that "(u)pon inquiry, it appeared that the debate had been arranged by the stations * * *." Hearings on S. 251 Before the Subcommittee on Communications of the Senate Committee on Commerce, 88th Cong., 1st Sess., 85 (Report of Federal Communications Commission Concerning Complaints Received During the 1962 Elections and Similar Complaints Received to June 1, 1963). The ruling in Columbia Broadcasting System, Inc., supra note 11, dealt with broadcast of presidential candidates' press conferences "in whole or in substantial part on a live or slightly delayed basis * * *." 40 FCC at 396, 3 P & F Radio Reg.2d at 624 (emphasis added)
 
 
 [108]
 See UCC br. at 18-25; Chisholm reply br. at 19-21. Information about the impact of its rulings on the political process is what Congress had in mind when it required the Commission to include in its reports information sufficient to allow a congressional determination whether the 1959 amendment is "effective and practicable." See note 87 supra and accompanying text
 
 
 [109]
 For example, the Commission's legislative proposals, see note 2 supra and accompanying text, retain the equal opportunities principle but require that candidates have "significant public support" to be eligible to claim equal time. See FCC, 39th Annual Report, supra note 2, at 39. A similar approach to press conferences and debates, assuming arguendo that the Commission has any authority to treat such broadcasts as exempt, would at least lessen the possible harmful impact of the Commission's ruling
 
 
 [110]
 The majority notes that the Commission "had the benefit of all arguments raised before this court." Majority op. at ---- of --- U.S.App.D.C., at 365 of 538 F.2d. While the statement is correct, the important point is that neither the Commission nor this court has had the benefit of a local perspective
 
 
 [111]
 The Commission's discretion must be exercised within the bounds established by Congress. See Parts I-A, I-B supra
 
 
 [112]
 55 FCC2d at 712 n.20, 35 P & F Radio Reg.2d at 67 n.20, JA 21-22 n.20; see 55 FCC2d at 704-705, 706 n.12, 35 P & F Radio Reg.2d at 56-60, 61 n.12, JA 151-153, 154 n.12. The Commission's claim that its earlier decisions rested on the "incidental to" test, see text accompanying notes 87-89 supra, is questionable. In Wyckoff, supra note 11, the Commission's opinion does not mention the "incidental to" test. The entire opinion deals with the broadcasters' contention that their judgment is the sole criterion for determining whether an event is a "bona fide news event." The Commission's summary of its decision makes this focus clear:
 In setting forth the above, the Commission does not, of course, question the bona fides of your news judgment or the manner in which it has been exercised by you. Rather, we make clear that this is not the sole criterion to be used in determining whether Section 315(a)(4) has been properly invoked.
 
 
 [40]
 FCC at 373, 24 P & F Radio Reg. at 404. In Columbia Broadcasting System, Inc., supra note 11, the Commission again did not mention the "incidental to" test. It did, however, quote extensively from its previous discussion explaining why good faith broadcaster judgment could not be the sole determinant of inclusion within § 315(a)(4). See 40 FCC at 397-398, 3 P & F Radio Reg.2d at 627-628. The Commission officially explained its decision to Congress by adverting only to this rationale:
 (The Commission) held further that (such press conferences) did not fall within the "on-the-spot coverage of bona fide news events." This part of the ruling was based on prior Commission findings that "if the sole test of the on-the-spot coverage exemption is simply whether or not the station's decision to cover the event and to put it on a broadcast program constitutes a bona fide news judgment, there could be no meaning to the other three exemptions in section 315(a) since these, too, all involve a bona fide news judgment by the broadcaster. * * *
 FCC, 31st Annual Report, supra note 49, at 86 (emphasis added).
 
 
 [113]
 The majority maintains that this "inconclusive" support is nevertheless "substantial." Majority op. at ---- of --- U.S.App.D.C., 357 of 538 F.2d. Interestingly, the majority does not attempt to identify this "substantial" support
 
 
 [114]
 The Commission's decision to reverse its long-standing holdings, accepted by both Congress and the industry (the decisions now overruled were never appealed), "was no sooner made than challenged." Davies Warehouse Co. v. Bowles, 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635, 643 (1944). This is not a case where the challenged administrative ruling "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933), quoted in, e. g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). Here, over the dissent of the only member who was serving when the exemptions were created, see note 13 supra, the Commission has overturned the nearly "contemporaneous construction of (the) statute by the men charged with the responsibility of setting its machinery in motion * * *." The Commission has based its action on its reading of a 17-year-old legislative history. In these circumstances our expertise is at least as great as the Commission's
 
 
 [115]
 The Commission relies on its discretion only to support its contention that it need not proceed by rule making. See 55 FCC 2d at 712 n.20, 35 P & F Radio Reg.2d at 67 n.20, JA 161 n.20
 
 
 [116]
 See text accompanying notes 80-81 supra